PORTO RICO TELEPHONE COMPANY, demandante y apelante, v. SOL LUIS DESCARTES, SECRETARIO DE HACIENDA DE PUERTO RICO, demandado y apelado.

Número 11034.

*Sometido:* 6 de abril de 1954. *Resuelto:* 29 de abril de 1957.

*Gonzalo Sifre* y *Horacio Franceschi,* abogados de la apelante; *Hon. Secretario de Justicia José Trías Monge* y *Edgar S. Belaval, Procurador Auxiliar,* abogados del apelado.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del Tribunal.

La Porto Rico Telephone Company, que en adelante llamaremos Rico Telco, es una corporación organizada bajo las

leyes de Delaware. Mantiene una oficina en San Juan y está autorizada para hacer negocios en Puerto Rico, donde opera un servicio telefónico como empresa de servicio público. La International Telephone and Telegraph Corporation, que en adelante llamaremos ITT, es una corporación organizada bajo las leyes de Maryland. Tiene oficina en la ciudad de New York y es dueña del 99.84% de las acciones de la Rico Telco. La ITT no mantiene oficina o sitio alguno de negocios en Puerto Rico.

En el año 1940 la Rico Telco declaró y pagó a sus accionistas dos dividendos de $54,000 cada uno. De cada uno de estos dividendos la Rico Telco pagó $53,829 a la ITT y $171 a varios accionistas individuales. Durante los años 1940–44 la Rico Telco efectuó ciertos pagos de intereses a la ITT y a la International Standard Electric Corporation, en su totalidad subsidiaria de la ITT, y a la que nos referiremos en adelante como la ISEC. Esta última es una corporación organizada bajo las leyes de Delaware. No tiene en Puerto Rico ni oficina ni sitio alguno de negocios.

En el año 1948 el entonces Tesorero notificó a la Rico Telco ciertas deficiencias en su contribución sobre ingresos debido a que ésta, como agente retenedor, no había retenido y pagado contribución sobre los anteriores dividendos y sobre pagos de intereses, como ingreso de las personas que en última instancia los recibieron de fuentes radicadas en Puerto Rico. La Rico Telco ha apelado de la sentencia dictada por el Tribunal Superior confirmando estas deficiencias.([1])

---

([1]) Para poder apelar a este Tribunal, la Rico Telco pagó al Tesorero la suma de $74,207.83, o sea la cantidad total aquí envuelta. De esta suma se pagaron $26,997.43 en relación con los dividendos del año 1940. Esta suma de $26,997.43 se descompone como sigue:

| Dividendos Pagados por Rico Telco en 1940 | | Deficiencias | 5% de Penalidad | 6% Interés hasta 12/26/52 | Total en Litigio |
|---|---|---|---|---|---|
| A ITT. | $107,658 | $15,475.84 | $773.79 | $10,706.69 | $26,956.32 |
| A otros: | 342 | 23.60 | 1.18 | 16.33 | 41.11 |
| | $108,000 | $15,499.44 | $774.97 | $10,723.02 | $26,997.43 |

# I

El problema de los dividendos pagados por la Rico Telco en el año 1940 envuelve dos cuestiones.  La primera es si algunas de las disposiciones "sustantivas" de nuestra Ley de

La parte restante de la suma de $74,207.83—$29,963.70 en relación con intereses pagados a la ITT y $17,246.70 provenientes de intereses pagados a ISEC—se descompone así:

| Interés Pagado por Rico Telco a ITT | Deficiencias | 5% de Penalidad | 6% Interés hasta 12/26/52 | Total en Litigio |
|---|---|---|---|---|
| 1940....... $17,801.60 | $2,558.98 | $127.95 | $1,770.38 | $4,457.31 |
| 1941....... 12,460.03 | 2,096.02 | 104.80 | 1,324.33 | 3,525.15 |
| 1942....... 15,830.67 | 3,155.01 | 157.75 | 1,804.14 | 5,116.90 |
| 1943....... 16,278.52 | 3,506.02 | 175.30 | 1,794.50 | 5,475.82 |
| 1944....... 34,468.54 | 7,583.08 | 379.15 | 3,426.29 | 11,388.52 |
| | | | | |
| $96,839.36 | $18,899.11 | $944.95 | $10,119.64 | $29,963.70 |

| Interés Pagado por Rico Telco A ISEC | | | | |
|---|---|---|---|---|
| 1940....... $4,326.71 | $621.96 | $31.10 | $430.29 | $1,083.35 |
| 1942....... 7,394.17 | 1,478.83 | 73.94 | 845.64 | 2,398.41 |
| 1943....... 24,642.03 | 5,350.85 | 267.54 | 2,738.74 | 8,357.13 |
| 1944....... 16,367.34 | 3,600.81 | 180.04 | 1,626.96 | 5,407.81 |
| | | | | |
| $52,730.25 | $11,052.45 | $552.62 | $5,641.63 | $17,246.70 |

Vemos, pues, que la Rico Telco estaba obligada a pagar al Tesorero sobre las partidas que figuran a continuación las siguientes sumas totales por concepto de deficiencias, penalidades e intereses:

| PARTIDA | TOTAL |
|---|---|
| Dividendos pagados por Rico Telco a ITT y otros............ | $26,997.43 |
| Intereses pagados por Rico Telco a ITT.................... | 29,963.70 |
| Intereses pagados por Rico Telco a ISEC.................. | 17,246.70 |
| | |
| | $74,207.83 |

Las sumas totales de las deficiencias, penalidades e intereses correspondientes a las tres partidas anteriores en los respectivos años, son las siguientes:

| | Deficiencias | 5% Penalidad | Intereses | Total |
|---|---|---|---|---|
| 1940....... | $18,680.38 | $934.02 | $12,923.69 | $32,538.09 |
| 1941....... | 2,096.02 | 104.80 | 1,324.33 | 3,525.15 |
| 1942....... | 4,633.84 | 231.69 | 2,649.78 | 7,515.31 |
| 1943....... | 8,856.87 | 442.84 | 4,533.24 | 13,832.95 |
| 1944....... | 11,183.89 | 559.19 | 5,053.25 | 16,796.33 |
| | | | | |
| | $45,451.00 | $2,272.54 | $26,484.29 | $74,207.83 |

Contribuciones sobre Ingresos impusieron una contribución a la ITT sobre los dividendos recibidos por ésta de la Rico Telco en el año 1940. Si se resolviera esta cuestión afirmativamente, surgiría la segunda cuestión: si la Rico Telco estaba obligada por algunas de las disposiciones "administrativas" de nuestra Ley a retener en el origen, de los dividendos pagados por ella a la ITT en el año 1940, la contribución correspondiente adeudada por la ITT.

*Primera—Responsabilidad de la ITT por la contribución en Litigio.*

Los dividendos expresamente caen dentro de la definición de "ingreso bruto" que aparece en la sec. 15(*a*) de la Ley. De acuerdo con la sec. 19(*a*)(2)(B), según fué enmendada por la sec. 3 de la Ley núm. 18, Leyes de Puerto Rico, Segunda Sesión Extraordinaria, 1927, los dividendos recibidos de una corporación extranjera por un individuo no residente se consideran como ingreso bruto derivado de fuentes radicadas en Puerto Rico, siempre y cuando no menos del 50% del ingreso bruto de dicha corporación extranjera correspondiente a los últimos tres años se haya derivado de fuentes radicadas en Puerto Rico.([1a]) La sec. 31(*b*) dispone que en el caso de una corporación extranjera ". . . ingreso bruto significa solamente ingreso bruto derivado de fuentes radicadas en Puerto Rico . . . en la forma dispuesta en la

---

([1a]) La sec. 19(*a*)(2)(B), según fué enmendada por la sec. 3 de la Ley núm. 18 de Junio 3, 1927, lee en parte como sigue:

"Sección 19.—(*a*) En el caso de un individuo no residente que no sea ciudadano de Puerto Rico las siguientes cantidades de ingreso bruto serán consideradas como ingreso derivado de fuentes radicadas dentro de Puerto Rico:

".        .        .        .        .        .        .        .

"(2) Las cantidades recibidas como beneficios de sociedades o como dividendos . . . (B) de una corporación extranjera, a no ser que menos del cincuenta (50) por ciento del ingreso bruto de dicha corporación extranjera, por el período de tres años, terminados al finalizar su año contributivo precedente a la declaración de tales dividendos . . . ha sido derivado de fuentes radicadas en Puerto Rico según se determina a virtud de las disposiciones de esta Sección."

sección 19".($^2$)   La sec. 28, según fué enmendada por la sec. 5 de la Ley núm. 2, Leyes de Puerto Rico, 1939, Sesión Extraordinaria, impone una contribución de 14.375% sobre el ingreso neto de corporaciones.($^3$)

La Rico Telco admite (1) que es una corporación extranjera de acuerdo con las definiciones consignadas en la sec. 2(*a*)(4) y (5) de la Ley, y (2) que derivó más del 50% de su ingreso de fuentes radicadas en Puerto Rico durante el período estatutario de tres años, según se requiere por la sec. 19(*a*)(2)(B).   Bajo estas circunstancias—en vista de la disposición de la sec. 31(*b*) de que el ingreso bruto de una corporación extranjera derivado de fuentes radicadas en Puerto Rico se determinará en la forma provista en la sec. 19—parecería claro sin ulterior discusión que la ITT, corporación extranjera, estaba obligada bajo la sec. 28 a pagar en el año 1940 una contribución de 14.375% sobre el ingreso recibido por ella atribuíble a Puerto Rico, incluyendo los dividendos recibidos en 1940 de la Rico Telco, menos los créditos o deducciones provistas en la Ley.($^4$)

---

($^2$) La sec. 31—13 L.P.R.A. sec. 735—define el ingreso bruto de corporaciones así:

"(*a*) En el caso de una corporación . . . *sujeta a la contribución impuesta por la sección 28* el término 'ingreso bruto' significa el ingreso bruto definido en las secciones 15 y 19 . . .

"(*b*) En el caso de una corporación extranjera, 'ingreso bruto' significa solamente ingreso bruto derivado de fuentes radicadas en Puerto Rico, determinado . . . en la forma dispuesta en la sección 19." (Bastardillas nuestras.)

($^3$) La sec. 28, según fué enmendada por la sec. 5 de la Ley núm. 2 de 1939, dispone como sigue:

"Se impondrá, cobrará y pagará por cada año contributivo sobre el ingreso neto de toda corporación o sociedad una contribución de 14.375 por ciento del montante del ingreso neto que exceda de los créditos provistos en la sección 34."

($^4$) Más adelante se discute (1) la obligación de la ITT de rendir una planilla en la que podría reclamar deducciones por dichos dividendos bajo la sec. 32(*a*)(6)(B); (2) la eliminación retroactiva, a partir del día 1 de enero de 1940, de tales deducciones como cuestión de derecho sustantivo, por la Ley núm. 31 de 1941; y (3) el aumento retroactivo en 1941, efectivo el día 1 de enero de 1940, del tipo de contribución sobre corporaciones extranjeras de 14.375% hasta 19% por la enmienda de la sec. 28 contenida en la Ley núm. 31 de 1941.

El primer argumento de la apelante contra esta conclusión, según lo entendemos, es en sustancia el siguiente: La frase empleada en la sec. 31 (a) que hemos subrayado en la cita de la sec. 31 (a) en el escolio 2—"sujeta a la contribución impuesta por la sección 28"—deberá también injertarse en la sec. 31 (b). A menos que dicha sec. 31 (b) se lea de este modo, la Asamblea Legislativa estaría tratando de imponer una contribución a las corporaciones de todo el mundo que no tienen conexión alguna con Puerto Rico. Además, si la sec. 31 (b) no incluye esta frase, las corporaciones extranjeras no estarían sujetas a ninguna contribución por no estar sujetas a tributación bajo ninguna sección que no sea la sec. 28. Por consiguiente—leyendo la sec. 31 (b) en el sentido de que incluye la frase "sujeta a la contribución impuesta por la sección 28"—debemos, pues, determinar qué corporaciones extranjeras están sujetas a la contribución impuesta por la sec. 28. Para el año 1940, a las únicas corporaciones extranjeras que la Asamblea Legislativa tuvo en mente imponer contribuciones eran aquellas corporaciones extranjeras, como la Rico Telco, que mantienen oficina y hacen negocios en Puerto Rico.

No estamos de acuerdo con este argumento. Debe admitirse que la sec. 28 está redactada en un lenguaje que parece indicar que por la misma se impone una contribución como tal. Pero el fin primordial de la sec. 28 es fijar el tipo de la contribución para corporaciones y sociedades. Esto surge no solamente del lenguaje claro de la sec. 28 sino también de su historial legislativo: los únicos cambios sustanciales hechos por la Asamblea Legislativa en la sec. 28 en el curso de los años han sido aumentos en el tipo de contribución provisto en dicha sección. (5)  A fin de determinar qué corporaciones es-

---

(5) Sec. 28 de la Ley núm. 74, Leyes de Puerto Rico, 1925; Sec. 5 de la Ley núm. 2, Leyes de Puerto Rico, 1939, Sesión Extraordinaria; Sec. 14 de la Ley núm. 31, Leyes de Puerto Rico, 1941; Sec. 4 de la Ley núm. 23, Leyes de Puerto Rico, 1941, Sesión Extraordinaria; Sec. 8 de la Ley núm. 20, Leyes de Puerto Rico, 1942, Segunda y Tercera Sesiones Extraordinarias; Sec. 1 de la Ley núm. 88, Leyes de Puerto Rico, 1945; Art. 1 de la Ley núm. 317, Leyes de Puerto Rico, 1949, retroactivo al 1 de julio de 1945; 13 L.P.R.A. sec. 731.

tán sujetas a la contribución y qué porciones de sus ingresos constituyen ingreso tributable, debemos examinar el resto de la Ley. En verdad, si esto no fuera cierto, de acuerdo con la fraseología de la sec. 28 "toda corporación" en el mundo estaría teóricamente sujeta a nuestra contribución sobre ingresos—resultado que obviamente la Asamblea Legislativa no tuvo en mente.

Teniendo en cuenta que la sec. 28 fija primordialmente el tipo de contribución y que otras secciones de la Ley—tales como las secs. 15 (a), 19 (a) (2) (B), y 31 (b)—determinan qué corporaciones extranjeras deberán pagar la contribución y qué porción de su ingreso está sujeto a tributación, no vemos fundamento alguno en el argumento de la Rico Telco de que la sec. 31 (b) debe leerse como si contuviera la frase ". . . sujeta a la contribución impuesta por la sección 28 . . . ." Si interpretásemos la sec. 28 en el sentido de establecer el tipo contributivo para corporaciones, inmediatamente convenimos que debe leerse conjuntamente con ambas secs. 31 (a) y 31 (b). En ese sentido, la sec. 31 (a) al igual que la sec. 31 (b) están "sujetas" a la sec. 28; en otras palabras, el tipo contributivo fijado en la sec. 28 es aplicable dondequiera que se impone contribución al ingreso bruto, tal como éste se define en las secs. 31 (a) y 31 (b). Y esto es cierto no obstante el hecho de que la frase ". . . sujetas a la contribución impuesta por la sección 28 . . ." se encuentra en la sec. 31 (a) y no aparece en la sec. 31 (b). En verdad, esto es tan claro que si dicha frase hubiese sido omitida de la sec. 31 (a) así como también de la sec. 31 (b), la hubiésemos injertado, no obstante, en la sec. 31 (a) al igual que en la sec. 31 (b)—o en otras palabras, conjuntamente con—la sec. 28 en el sentido en que ésta ha sido interpretada por nosotros.

Debemos añadir que aun si leyéramos la sec. 31 (b) en el sentido de incluir la frase ". . . sujeta a la contribución im-

puesta por la sección 28 . . .", no podríamos concluir que para el año 1940 el propósito de la Asamblea Legislativa fué imponer contribución únicamente a aquellas corporaciones extranjeras que tuvieran oficinas y estuvieran haciendo negocios en Puerto Rico. Nada hay en las secs. 28, 31 o en alguna otra sección de la Ley que sostenga la posición de la apelante a este respecto. Más bien, como ya hemos indicado, las secs. 15(a), 19(a) (2) (B) y 31(b), al leerse conjuntamente, demuestran sin lugar a dudas que las corporaciones extranjeras que reciban dividendos que cumplan con el requisito del 50% por un período de tres años provisto en la sec. 19(a) (2) (B), deberán pagar nuestra contribución de ingreso, tengan o no oficinas y hagan o no negocios en Puerto Rico.([6])

Encontramos que los otros fundamentos alegados por la apelante en apoyo de su contención de que en el año 1940 nuestra Ley no le imponía contribución sobre los dividendos recibidos de la Rico Telco en el año 1940 carecen igualmente de méritos. No obstante creemos más conveniente discutirlos en relación con las disposiciones administrativas relativas a la retención.([7])

---

([6]) La sec. 35 es primordialmente una disposición administrativa sobre retención que discutimos en la sección *Segunda* de esta Parte de la presente opinión. No obstante, vale la pena señalar aquí que, al disponer la retención de una contribución de 14.375% sobre el ingreso recibido de fuentes radicadas en Puerto Rico por corporaciones extranjeras que no tengan oficina y no hagan negocios aquí, la sec. 35 sostiene nuestra conclusión de que el ingreso de corporaciones extranjeras procedente de fuentes radicadas en Puerto Rico—como se define en las secs. 15(a), 19(a) (2) (B), y 31(b)— estaba sujeto a contribución en el año 1940, no obstante el hecho de que tales corporaciones extranjeras, como en el caso de la ITT, no hicieron negocios en Puerto Rico y no mantenían una oficina aquí.

([7]) Estos otros fundamentos son (1) que la sec. 32(a) (6) (B)—que provee una deducción a favor de corporaciones por concepto de dividendos, tal como se definen en esa sección, recibidos por la corporación—demuestra que únicamente aquellas corporaciones extranjeras que mantengan una oficina o hagan negocios en Puerto Rico estaban sujetas a nuestra contribución sobre ingreso en el año 1940; (2) que la ITT no estaba sujeta a tributación bajo la sec. 28 en el año 1940 porque, bajo la sec. 32(a) (6) (B), supuestamente podía deducir el importe total de los dividendos que recibió de la Rico Telco en el año 1940, reduciendo a "cero" su ingreso neto procedente de fuentes puertorriqueñas; y (3) que el propósito legislativo no fué

Nuestra conclusión es que la ITT estaba obligada a pagar contribuciones sobre el ingreso recibido por ella atribuíble a Puerto Rico, incluyendo los dividendos que recibió en el año 1940 de la Rico Telco, menos cualesquiera créditos o deducciones provistas en la Ley. Véase el escolio 4.

*Segunda—La Rico Telco estaba obligada a retener en el origen la contribución sobre los dividendos pagados por ella a la ITT en el año 1940.*

▄▄▄ Notamos, como punto preliminar, que esta cuestión es distinta a la responsabilidad de la ITT, como cuestión de derecho sustantivo, por la contribución envuelta en este litigio. Las disposiciones de la Ley relativas a retención no imponen contribuciones. Su único propósito es administrativo toda vez que proveen para el cobro en el origen, por conducto del agente retenedor, de las contribuciones impuestas por otras secciones de la Ley a la persona que en última instancia recibe el ingreso neto. Y a dichas disposiciones sobre retención no se les da efecto retroactivo en vista de que a un agente retenedor no se le puede exigir que haga retención alguna del ingreso ya distribuído por él a la persona que en última instancia lo recibió. *Central Aguirre* v. *Tribunal de Contribuciones,* 64 D.P.R. 268, 275–276.(8)

La Rico Telco alega que no existía ninguna disposición administrativa en la Ley durante el año 1940, que exigiera a la Rico Telco retener en el origen y pagar a nombre de la ITT una contribución retenida sobre los dividendos que la Rico Telco distribuyó a la ITT en el 1940. No estamos de acuerdo. Por el contrario, de acuerdo con la sec. 22(a), según fué enmendada por la sec. 4 de la Ley núm. 2, Leyes de Puerto Rico, 1939, Sesión Extraordinaria, toda persona que

imponer una contribución sobre los dividendos de que aquí se trata por no haberse dispuesto en la sec. 22(a), según fué enmendada por la Ley núm. 2 de 1939, que se retuviera en el origen una contribución sobre los dividendos pagados a una corporación extranjera que no estuviere haciendo negocios en Puerto Rico.

(8) Más adelante en esta opinión expresamente se revocan algunos extremos de nuestra decisión en el caso de *Aguirre.* Véanse escolios 16 y 12. No obstante, nos adherimos a aquella parte de la opinión a las páginas

pagare un dividendo en el año 1940 a un individuo no residente que no fuera ciudadano de Puerto Rico estaba en la obligación de retener de dicho dividendo la contribución ". . . normal y adicional . . ." fijada por la Ley.([9])   Y la sec. 35, según fué enmendada por la sec. 6 de la Ley núm. 2 de 1939, disponía que "En el caso de corporaciones . . . extranjeras . . . que no se dediquen a . . . negocio dentro de Puerto Rico, y que no tengan oficina. . . en la Isla, se deducirá y retendrá en el origen y en la misma forma y sobre las mismas partidas de ingreso que se provee en la sección 22 una contribución igual al catorce y tres octavos (14.375) por ciento de dicho ingreso y dicha contribución deberá ser declarada y pagada del mismo modo y sujeta a las mismas condiciones que se disponen en aquella sección."   Vemos, por tanto, que durante 1940, por virtud de las secs. 22 (a) y 35, tal como disponían en dicho año, en el caso de corporaciones extranjeras se requería que se retuviesen las contribuciones al mismo tipo—14.375%—que se imponía a dichas corporaciones bajo la sec. 28 de la Ley tal como ésta disponía en el año 1940.([10])

---

275–6 en que se resuelve que las disposiciones sobre retención de nuestra Ley no tienen efecto retroactivo.   Por otro lado, como se verá más adelante, dejamos abierta la cuestión del efecto de la sec. 1 de la Ley núm. 54 de 1945 sobre la Rico Telco como agente retenedor, véase escolio 21.

([9]) La sec. 22 (a), según fué enmendada por la sec. 4 de la Ley núm. 2 de 1939, leía así:

"Todas las personas, cualquiera que sea la capacidad en que actúen, incluyendo arrendatarios o acreedores hipotecarios de propiedad mueble e inmueble, fiduciarios, principales o patronos y todos los funcionarios y empleados de El Pueblo de Puerto Rico que tengan el control, recibo, custodia, disposición, o pago de intereses, rentas, sueldos, salarios, comisiones, premios, anualidades, compensaciones, remuneraciones, emolumentos u otras ganancias, *dividendos*, participación en beneficios de sociedades, y *otros* beneficios o ingresos anuales o periódicos, fijos o determinables, de cualquier individuo no residente que no sea ciudadano de Puerto Rico, deberán (a menos que se disponga otra cosa en los reglamentos que el Tesorero prescriba en virtud de la sección 19), deducir y retener de *dichas ganancias, beneficios o ingresos* anuales o periódicos, la contribución normal y adicional fijada por esta Ley; . . .".   (Bastardillas nuestras.)

([10]) La sec. 14 de la Ley núm. 31, Leyes de Puerto Rico, 1941, enmendó la sec. 28, para tener efecto retroactivo al día 1 de enero de 1940, aumen-

Con anterioridad al año 1939, en la sec. 22 (a) no se hacía mención específica de dividendos. Véase la sec. 6 de la Ley núm. 102, Leyes de Puerto Rico, 1936, que enmienda la sec. 22 (a). Por la sec. 4 de la Ley núm. 2 de 1939, la Asamblea Legislativa insertó deliberadamente la palabra "dividendos" en la sec. 22 (a) en el sitio en que aparece en bastardillas en el escolio 9. Pero la Rico Telco arguye, no obtante, que la inserción de la palabra "dividendos" en dicho sitio no requería la retención de una contribución sobre dividendos. Su teoría es que dividendos son "a distinción de" y "no sinónimo de" *ganancias, beneficios o ingresos*, y que, por consiguiente, el hecho de que la sec. 4 de la Ley núm. 2 de 1939 no incluyera la palabra *dividendos* en esta última frase, en el sitio que aparece en bastardillas en el escolio 9, demuestra que el propósito legislativo fué que se retuviera la contribución sobre *ganancias, beneficios o ingresos*, pero no sobre *dividendos*.

tando la contribución de 14.375% hasta 19% para corporaciones extranjeras. Como cuestión de derecho sustantivo, este aumento retroactivo de la contribución adeudada por la ITT sobre el ingreso recibido por ésta por concepto de dividendos de la Rico Telco en los años 1940 y 1941, era válido. *Ballester* v. *Tribunal de Apelación*, 61 D.P.R. 474, 501–505, confirmado en *Ballester-Ripoll* v. *Court of Tax Appeals*, 142 F.2d 11 (C.A. 1, 1944), *certiorari* denegado 323 U. S. 723; *Central Aguirre* v. *Tribunal de Contribuciones*, supra, pág. 273.

No obstante, la cuestión de si el aumento retroactivo que la ITT estaba obligada a pagar, como cuestión de derecho sustantivo, puede cobrársele a la Rico Telco como agente retenedor, envuelve un problema distinto. A fin de coordinar con la enmienda de la sec. 28 aumentando el tipo contributivo, la sec. 35—la disposición administrativa sobre retención—fué también enmendada por la sec. 17 de la Ley núm. 31 de 1941 a fin de disponer la retención en el origen de un 19% en lugar de 14.375%. Pero esta disposición sobre retención se aplica prospectiva y no retroactivamente, véase el escolio 8. En verdad, en este caso el Tesorero no hace alegación en sentido contrario: En el año 1948 el Tesorero notificó a la Rico Telco la deficiencia sobre dividendos pagados por ella a la ITT en el año 1940 y sobre la porción de los dividendos pagados en el 1941, antes del 12 de abril de 1941, a razón de 14.375% en vez de 19%. Como en este caso no se dió ningún paso para cobrar la diferencia entre la contribución de 14.375% y la de 19% sobre dichos dividendos, no hacemos ningún comentario sobre el efecto de la sec. 1 de la Ley núm. 54 de 1945 en esta porción de la deficiencia, véase el escolio 21.

Rechazamos ésta como una interpretación torcida e injustificada de la sec. 22(a), tal como disponía después de ser enmendada por la sec. 4 de la Ley núm. 2 de 1939. Al insertarse la palabra "dividendos" en la sec. 22(a) por la sec. 4 de la Ley núm. 2, el propósito de la Asamblea Legislativa fué claramente sujetar los dividendos a las disposiciones sobre retención de la sec. 22(a). Carece de fundamento la contención de la apelante de que en el contexto de la sec. 22(a) "dividendos" significa algo distinto a "ingresos". La sec. 22(a) empieza enumerando las partidas a las cuales serán aplicables sus disposiciones sobre retención. Esta lista termina con la abarcadora frase "... y *otros* beneficios o ingresos anuales o periódicos, fijos o determinables ..." (Bastardillas nuestras.) El uso de la palabra "otros" en la frase abarcadora demuestra que la Asamblea Legislativa consideró las partidas expresamente enumeradas—incluyendo dividendos—como "ingresos" dentro del significado de la sec. 22(a). Además la sec. 22(a) concluye disponiendo la retención "... de *dichas* ganancias, beneficios o ingresos anuales o periódicos ..." (Bastardillas nuestras.) El vocablo "dichas" claramente abarca tanto la lista específica de partidas, que incluye dividendos, como "... otros ... ingresos ... fijos ...". De esto surge que de acuerdo con la sec. 22(a), según fué enmendada por la sec. 4 de la Ley núm. 2 de 1939, la Rico Telco estaba obligada a retener la contribución de los dividendos pagados por ella a la ITT durante el año 1940.

■ Alega la apelante que la Asamblea Legislativa utilizó la ley federal como modelo, y que de acuerdo con esta última con anterioridad al año 1936 "... las corporaciones domésticas no estaban obligadas a retener y pagar contribución sobre dividendos distribuídos a los extranjeros no residentes." Pero, como dice la propia apelante, los dividendos fueron expresamente incluídos en las disposiciones de la ley federal sobre retención respecto a los extranjeros no residentes en el año 1936. 49 Stat. 1648–1756. No era, por lo tanto, sorprendente que Puerto Rico hiciera un cambio aná-

logo en la sec. 22 (*a*) por virtud de la sec. 4 de la Ley núm. 2 de 1939. De todos modos, aunque nuestro estatuto fué originalmente estructurado en el año 1925 a base de la Ley Federal de 1924, ha sido enmendado en muchos aspectos desde esa fecha. Y este Tribunal deberá determinar el significado y efecto de dichas enmiendas, incluyendo la enmienda de la sec. 22 (*a*) por la sec. 4 de la Ley núm. 2 de 1939. Véase *Iglesias Costas et al.* v. *Secretary of Finance*, 220 F.2d 651 (C.A. 1, 1955).

La apelante también alega que la sec. 22 (*a*), según ha sido enmendada por la sec. 4 de la Ley núm. 2 de 1939, no es aplicable al presente caso por cuanto "los dividendos pagados por la Porto Rico Telephone Company no son 'dividendos . . . de cualquier no residente', sino dividendos de una corporación extranjera residente." Pero al referirse a "dividendos . . . de cualquier no residente . . .", es evidente que la sec. 22 (*a*) se refiere a dividendos de quien en última instancia los recibe, no del distribuidor. Aquí la ITT fué quien los recibió en última instancia. Y como se ha visto ya, la sec. 35, según ha sido enmendada por la sec. 6 de la Ley núm. 2 de 1939, dispone la retención en la misma forma que se provee en la sec. 22 para el ingreso procedente de fuentes radicadas en Puerto Rico que se pague a una corporación extranjera, como lo es la ITT, que no tiene oficina y no hace negocios en Puerto Rico.

Pasamos ahora a considerar las tres contenciones de la apelante que envuelven tanto las disposiciones sustantivas como las disposiciones administrativas sobre retención de la Ley. Véase el escolio 7. La primera de dichas contenciones es que, según la Rico Telco, la sec. 32 (*a*) (6) (B) de la Ley y el art. 276 del Reglamento apoyan su criterio de que únicamente las corporaciones extranjeras que tengan una oficina o hagan negocios en Puerto Rico estaban sujetas a nuestra contribución de ingresos en 1940. La sec. 32 (*a*) (6) (B), bajo el título "Deducciones Admitidas a Corporaciones y Sociedades", disponía que, al computar su in-

greso neto, las corporaciones podrán deducir los dividendos recibidos de corporaciones extranjeras siempre que se demostrara ". . . a satisfacción del Tesorero que más del 50 por ciento del ingreso bruto de dicha corporación extranjera, por el período de los tres años terminados al cerrar su año contributivo que precede a la declaración de dichos dividendos . . . han sido derivadas de fuentes radicadas en Puerto Rico, según se determina a virtud de la sección 19 . . .". Para nuestros fines, el art. 276 es sustancialmente al mismo efecto.

La apelante alega que si la ITT hubiera estado de hecho sujeta a tributación bajo la sec. 28, pudo haber deducido el importe total de los dividendos que recibió de la Rico Telco; que su ingreso neto procedente de fuentes puertorriqueñas se hubiera entonces reducido a "cero"; que ese resultado "absurdo" no pudo haber sido la intención de la Asamblea Legislativa; y que, por lo tanto, el propósito de esta última no pudo haber sido exigir a las corporaciones extranjeras, como lo es la ITT—que no tienen oficinas ni hacen negocios en Puerto Rico—que paguen contribución sobre dividendos recibidos de fuentes radicadas en Puerto Rico.

No estamos conformes. En virtud de las secs. 19 (f), 37 (a), 39 (a) de la Ley y del art. 199 del Reglamento, la ITT—corporación extranjera que recibe ingresos de fuentes radicadas en Puerto Rico—estaba en la obligación de presentar una declaración (37a) ". . . demostrando específicamente las partidas de su ingreso *bruto* y las deducciones y créditos admisibles por este título." (Bastardillas nuestras.) ([11]) Re-

---

([11]) Desde el año 1925, en que originalmente se aprobó la Ley, hasta el 1941, cuando se aprobó la Ley núm. 31, Leyes de Puerto Rico, 1941, la sec. 19 (f) leía del modo siguiente:

"Un individuo no residente que no sea ciudadano de Puerto Rico recibirá el beneficio de las deducciones y créditos concedidos por este título solamente cuando rinda o haga rendir en la oficina del Tesorero una declaración verdadera y exacta de su ingreso total recibido de cualesquiera fuentes en Puerto Rico, en la forma prescrita por este título; incluyendo en dicha declaración toda la información que el Tesorero estime necesaria para determinar dichas deducciones y créditos."

conocemos que al preparar una planilla de su ingreso bruto y calcular su ingreso neto en 1940, la ITT pudo haber tenido derecho bajo la sec. 32 (*a*) (6) (B), *tal como regía en el año 1940*, a deducir los dividendos recibidos de la Rico Telco en el año 1940. *Cf.* escolios 10, 14 y el texto que le precede, 15 y 18. Sin embargo, la sec. 32 es la sección general que especifica las distintas deducciones admitidas a las corporaciones. Ya hemos concluído en la sección *Primera* de esta Parte de esta opinión que en el año 1940 la Rico Telco estaba en la obligación—en virtud de la disposición administrativa consignada en la sec. 22 (*a*), tal como regía en el año 1940— de retener en el origen, en su carácter de agente, y pagar al Tesorero a nombre de la ITT, de los dividendos pagados por la Rico Telco a la ITT en el año 1940, el importe de la contribución impuesta a la ITT por la sec. 28 de acuerdo con la fórmula provista en las secs. 15 (*a*), 19 (*a*) (2) (*b*), y 31 (*b*). Por lo tanto, no correspondía a la Rico Telco, como agente

La sec. 11 de la Ley núm. 31 de 1941 adicionó a la sec. 19 (*f*) algunos *disponiéndose* de naturaleza sustantiva que no tienen pertinencia al presente caso. Véase 13 L.P.R.A. sec. 698 (*f*).

La sec. 37 (*a*), 13 L.P.R.A. sec. 740, disponía desde el origen de la Ley que "Toda corporación o sociedad sujeta a tributación a virtud de este título presentará una declaración, demostrando específicamente las partidas de su ingreso bruto y las deducciones y créditos admisibles por este título . . . Si cualquier corporación extranjera no tiene oficina o punto de negocio en Puerto Rico, pero tiene un agente en la Isla, la declaración será presentada y jurada por el agente. . . .".

La sec. 39 (*a*), 13 L.P.R.A. sec. 741, también desde el origen de la Ley, ha dispuesto lo siguiente:

"Las declaraciones de corporaciones o de sociedades se rendirán en la fecha establecida en la subdivisión (*a*) de la sección 27, excepción hecha de que, tratándose de corporaciones extranjeras sin oficina o sitio de negocios en Puerto Rico, las declaraciones se harán en la fecha que establece la sección 27 para los individuos no residentes que no fueren ciudadanos de Puerto Rico."

El art. 199 del Reglamento dispone en parte que "A menos que un individuo no residente que no sea ciudadano de Puerto Rico, una corporación extranjera, o un ciudadano de Puerto Rico, o corporación doméstica, radicare o hiciere radicar con el colector una declaración fiel y exacta de ingresos procedentes de fuentes radicadas en Puerto Rico, independientemente de la cantidad, la contribución se cobrará a base del ingreso bruto (no del ingreso neto) procedente de fuentes radicadas en Puerto Rico."

retenedor, el determinar las deducciones, si algunas había, a que la ITT tenía derecho en el 1940 bajo la sec. 32 o cualquiera otra sección. Éste no es un caso en que estén envueltas partidas de ingreso totalmente exentas de tributación. *Cf.* 10 Mertens, *Law of Federal Income Taxation,* sec. 56.32, págs. 149–50.([12]) El único interés que tenía la Rico Telco en este asunto era retener y pagar la contribución como lo exigen las secs. 22(a) y 35. Lo correcto hubiera sido que la *ITT* reclamara las deducciones, incluyendo la deducción, de haber alguna, provista en la sec. 32(a)(6)(B), en la planilla que la *ITT* estaba obligada a presentar en el 1940 y que aparentemente no presentó. Véase el escolio 11, en particular el art. 199 del Reglamento.([13]) Es más, la sec. 32(a)(6)(B) fué derogada por la sec. 15 de la Ley núm. 31, Leyes de Puerto Rico, 1941, para tener efecto retroactivo al día 1 de enero de 1940; el resultado fué que, como cuestión de derecho contributivo sustantivo, la ITT fué privada válidamente—con efecto retroactivo al día 1 de enero de 1940—del derecho a toda deducción bajo la sec. 32(a)(6)(B) por concepto de dividendos que recibió de la Rico Telco en el 1940. Véase el escolio 10.([14])

El segundo de estos dos argumentos—que está íntimamente relacionado con el primero—es que la ITT no

([12]) En el caso de *Aguirre,* pág. 274, tratamos el derecho a reclamar una deducción por concepto de dividendos en efecto como una exención. Esto fué un error.

([13]) *Cf. Postley* v. *Secretario de Hacienda,* 75 D.P.R. 874, en que el contribuyente no residente en pleito de reintegro—no el agente retenedor—atacó con éxito una contribución discriminatoria amparándose en la cláusula sobre privilegios e inmunidades.

([14]) Como de los autos no aparece ninguna planilla de la ITT o de la Rico Telco, ni hay constancia sobre si hacían negocios a base de año fiscal o natural, no está claro si la eliminación retroactiva del derecho de la ITT a deducir los dividendos recibidos en el 1940 fué decretada en una fecha —12 de abril de 1941—anterior a la fecha en que se exigía, de acuerdo con las secs. 39(a) y 27(a) de la Ley, que la ITT radicara su planilla por los ingresos de 1940 recibidos de fuentes radicadas en Puerto Rico. De todos modos, la sec. 26 de la Ley núm. 31 de 1941 exigía que se radicaran planillas corregidas indicando la responsabilidad contributiva retroactiva resultante de la Ley núm. 31.

estaba sujeta a tributación bajo la sec. 28 en 1940, por el fundamento de que podía alegadamente deducir el importe total de los dividendos que recibió de la Rico Telco en el año 1940 bajo la sec. 32(a) (6) (B), tal como regía en esa fecha, reduciendo a "cero" su ingreso neto recibido de fuentes puertorriqueñas. Pero el hecho de que una fuente de ingreso de una corporación extranjera pueda haber sido deducible bajo la sec. 32, tal como regía en el 1940, no la eximía por ese motivo de responsabilidad bajo otras secciones aplicables al tipo provisto en la sec. 28. En verdad, la apelante no pudo haberle dado mucho crédito a esta contención: en el 1940 la Rico Telco retuvo y pagó al Tesorero las contribuciones adeudadas por la ITT sobre los honorarios de administración montantes a $47,937.72, pagados en ese año por la Rico Telco a la ITT.([15])

■ Como tercera y última contención, la apelante sostiene que como el único modo efectivo de cobrar contribuciones bajo las circunstancias que rodean este caso es mediante la fórmula de retención provista en la sec. 35, el propósito legislativo no pudo haber sido imponer una contribución sobre los dividendos aquí envueltos, ya que no se requería en la sec. 22(a), según fué enmendada por la sec. 4 de la Ley núm. 2 de 1939, que se retuviera en el origen una contribución sobre dividendos pagados a una corporación extranjera que no haga negocios en Puerto Rico. La contestación sucinta a este argumento, como ya se ha resuelto, es que la sec. 22(a),

---

([15]) De acuerdo con el Exhibit A, en el año 1940 la Rico Telco retuvo y pagó al Tesorero la suma de $6,891.05 por concepto de contribuciones adeudadas por la ITT—a razón del 14.375% provisto en esa fecha en la sec. 28—sobre los honorarios de administración ascendentes a $47,937.72 pagados ese año por la Rico Telco a la ITT. Sin embargo, en la demanda enmendada se alega, y el Tesorero admite en su contestación, que se retuvieron $9,108.17, o sea, la contribución sobre dicha suma al tipo de 19%. El Exhibit A indica que "la deficiencia" fué pagada el día 25 de junio de 1952. De los autos no aparece por qué la diferencia entre $6,891.05 y $9,108.17 se pagó en esa fecha como contribución retroactiva, ni indicación alguna de que se radicara una planilla corregida, de acuerdo con la sec. 26 de la Ley núm. 31 de 1941, véase el escolio 14.

según fué enmendada en el 1939, de hecho requería que se retuviera en el origen la contribución sobre dichos dividendos.

Alega la apelante que la ITT ". . . se convirtió por primera vez en contribuyente, respecto a los dividendos recibidos de Puerto Rico, y la Porto Rico Telephone Company se convirtió en agente retenedor para ese propósito . . .", por virtud de la enmienda de la sec. 22 (a) mediante la sec. 12 de la Ley núm. 31 de 1941, por la que por primera vez se insertó la palabra "dividendos" en la última parte de la sec. 22 (a) entre "ganancias" y "beneficios" en la frase "dichas ganancias, dividendos, beneficios e ingresos anuales o periódicos . . .". Véase el escolio 9. Tampoco estamos de acuerdo. En primer lugar, la sec. 22 (a) nada tiene que ver con la cuestión de la responsabilidad sustantiva de la ITT por la contribución aquí envuelta; como se ha visto, esa responsabilidad sustantiva existía en el 1939 bajo otras secciones de la Ley. En segundo lugar, aun respecto a la disposición administrativa sobre retención, por las razones ya expresadas, la sec. 22 (a), según fué enmendada por la sec. 4 de la Ley núm. 2 de 1939, ya disponía la retención en el caso de dividendos; aun cuando la inserción de la palabra "dividendos" en el lugar indicado eliminaba toda duda posible sobre esta cuestión, dicha inserción era innecesaria. *Cf. Ballester* v. *Tribunal de Apelación*, supra, 493.

La apelante descansa en el caso de *Central Aguirre* v. *Tribunal de Contribuciones*, supra. En ese caso en el año 1940 la demandante, una corporación doméstica, pagó dividendos a su accionista principal, un fideicomiso de Massachusetts conocido por Central Aguirre Associates que no tenía oficina o negocio alguno en Puerto Rico. El ingreso bruto de la Associates durante ese año consistió totalmente de dividendos recibidos de corporaciones puertorriqueñas, incluyendo los dividendos recibidos de la demandante.

En el caso de *Aguirre* resolvimos que no fué la intención legislativa hacer aplicable, con efecto retroactivo al ingreso del 1940, la enmienda de la sec. 22 (a) hecha por la sec. 12 de

la Ley núm. 31 de 1941. Pero, de hecho, esa cuestión no estaba envuelta en el caso de *Aguirre*. La discutimos porque estábamos bajo la errónea impresión de que en el 1940 el estatuto aplicable era la sec. 22(a), según fué enmendada por la sec. 6 de la Ley núm. 102, Leyes de Puerto Rico, 1936. Pero, por las razones ya expresadas, la sec. 22(a), *según fué enmendada por la sec. 4 de la Ley núm. 2 de 1939*, disponía la retención de dividendos pagados en 1940. Por consiguiente, en el caso de *Aguirre* no existía en verdad problema alguno en cuanto a la aplicación retroactiva de la disposición sobre retención, ya que la disposición sobre retención de 1939, expresamente cubriendo dividendos, estuvo en vigor durante todo el 1940. Nos ceñimos a la proposición general que no fué la intención legislativa el hacer aplicables las disposiciones sobre retención de 1939 y 1941, con efecto retroactivo, a los ingresos ya pagados a la persona que los recibe en última instancia por el agente retenedor. Véase el escolio 8. Pero en tanto en cuanto resuelve que la sec. 22(a), como existía en el 1940, no requería que se hiciera la retención respecto a dividendos, el caso de *Aguirre* queda expresamente revocado. ([16])

---

([16]) Sostiene en su alegato la apelante que, al referirnos a la Ley núm. 102 de 1936, en la pág. 271 del caso de *Aguirre*, simplemente cometimos un error "tipográfico u oficinesco", y que en dicho caso estábamos en realidad interpretando la sec. 22(a), según fué enmendada por la sec. 4 de la Ley núm. 2 de 1939. No estamos de acuerdo. Nuestro resumen de la sec. 22(a) que aparece a la pág. 271 del caso de *Aguirre* significativamente deja fuera la palabra "dividendos" que no aparecía en la versión de 1936 de la sec. 22(a) pero que sí apareció por primera vez en la versión de 1939. Además, en el caso de *Aguirre* dimos gran énfasis al lenguaje de la sec. 22(a), *tal como disponía en el 1936*, copiando la misma a la pág. 271 y subrayando la parte de la sección que excluía del requisito sobre retención los dividendos admitidos como crédito bajo la sec. 18(a). Pero la excepción en cuestión fué expresamente eliminada de la sec. 22(a) por la sec. 4 de la Ley núm. 2 de 1939.

La sec. 22(a), tal como disponía en el 1936, exceptuaba de sus requisitos sobre retención los dividendos recibidos por *individuos* por los cuales se les admitía un crédito bajo la sec. 18(a), tal como disponía en el 1940. Aparentemente supusimos en el caso de *Aguirre*, págs. 271-2, que esta disposición de la sec. 22(a), creando una excepción de sus requisitos sobre retención, era también aplicable a los dividendos recibidos por *corporaciones*

Además, a diferencia de la ITT en el presente caso, el accionista en el caso de *Aguirre*—la Associates—radicó su planilla el 14 de enero de 1941 declarando su ingreso bruto recibido de fuentes radicadas en Puerto Rico, tal como se exige por la sec. 37(*a*). *Central Aguirre Sugar Co.* v. *Tesorero,* supra, 353. Y en dicha planilla la Associates reclamó una deducción por concepto de dividendos amparándose en la sec. 32(*a*)(6)(B), según ésta disponía en aquel tiempo. El agente retenedor radicó su planilla el día 14 de marzo de 1941, pero no retuvo contribución alguna sobre los dividendos que pagó a la Associates. Bajo estas circunstancias, parti-

*extranjeras* que éstas tenían derecho a deducir de su ingreso bruto bajo la sec. 32(*a*)(6)(B), tal como disponía en el 1940. Esta suposición nuestra aparentemente se basó en la disposición de la sec. 35 de que la contribución sobre el ingreso de corporaciones extranjeras se retendrá en la misma forma que se provee en la sec. 22(*a*) para individuos. *Cf.* Art. 211 del Reglamento que aparece en el escolio 19. No es necesario volver a examinar este problema en vista de la eliminación de dicha excepción de la sec. 22(*a*) por la sec. 4 de la Ley núm. 2 de 1939.

Nada encontramos en el caso de *Próspero Fruit Co.* v. *Tribunal de Contribuciones,* 64 D.P.R. 661, citado por la apelante, que indique que al resolver el caso de *Aguirre* descansamos en la versión de 1939 y no en la de 1936 de la sec. 22(*a*). En resumen, lo que sucedió en el caso de *Aguirre* fué que pasamos por alto la versión de 1939 de la sec. 22(*a*) que era la aplicable, y erróneamente aplicamos a un caso en que estaba envuelta una contribución del 1940 la versión de 1936 de la sec. 22(*a*).

En el caso de *Aguirre* el Tribunal de Contribuciones cita en su opinión la Ley núm. 2 de 1939. *Central Aguirre Sugar Co.* v. *Tesorero,* 1 D.T.C. 348, 352-3. Pero en lugar de tratar de determinar el efecto de la Ley núm. 2 sobre las sec. 22(*a*), el Tribunal de Contribuciones descansó en la sec. 81(*b*) de la Ley. *Central Aguirre Sugar Co.* v. *Tesorero,* supra, págs. 359-61. Ninguna de las partes citó la Ley núm. 2 en su alegato ante este Tribunal. Tampoco el Tesorero solicitó reconsideración de nuestra opinión y decisión en el caso de *Aguirre,* en el que pasamos por alto la Ley núm. 2 de 1939.

Por el contrario, a la pág. 8 de su alegato ante el Tribunal en el caso de *Aguirre* los abogados del Tesorero hicieron la siguiente admisión incorrecta: "Es cierto que al tiempo de hacer la peticionaria el pago de dividendos a Central Aguirre Associates nada tenía que retener toda vez que dichos dividendos no estaban para esa fecha sujetos a tal contribución por la ley entonces en vigor." El Tesorero descansó en la sec. 81(*b*) de la Ley en la que, según se ha visto, el Tribunal de Contribuciones también basó su decisión. Ratificamos nuestro criterio expresado a la pág. 276 del caso de *Aguirre* de que la sec. 81(*b*) no es de aplicación.

cularmente en vista de la sec. 22 (d) y del art. 215 del Reglamento, (17) el agente retenedor estaba en mejor posición que la apelante en este caso para argumentar que de acuerdo con la sec. 22 (a)—aun como fué enmendada por la sec. 4 de la Ley núm. 2 de 1939—la no retención por su parte no perjudicaba la posición del Gobierno porque la planilla de la Associates de hecho demostraba que no debía contribución alguna al tiempo de presentarse ambas planillas. (18)    En

(17) La sec. 22 (d) reenactada como sec. 22 (f) por la sec. 6 de la Ley núm. 102, Leyes de Puerto Rico, 1936, lee así: "Si cualquier contribución, la deducción y retención de la cual se requiere por esta sección, se pagare por el receptor del ingreso, no deberá ser cobrada nuevamente al agente retenedor; y en casos en los cuales la contribución sea así pagada, no se impondrá o cobrará penalidad alguna al receptor del ingreso o al agente retenedor por dejar de incluir o pagar dicha contribución, a menos que dicha falta sea fraudulenta y con el propósito de evadir el pago."

El art. 215 del Reglamento lee así: "Declaraciones de Ingreso del cual se ha retenido la Contribución—El importe total del ingreso del cual se ha retenido la contribución se incluirá en el ingreso bruto sin hacerse deducción alguna por concepto de dicho pago de la contribución. Pero cualquier contribución que se haya efectivamente retenido se acreditará al importe total de la contribución tal como haya sido computada en la planilla del contribuyente. Véase el art. 69. Si la contribución fuere satisfecha por el receptor del ingreso o por el agente retenedor, no se cobrará nuevamente a la otra parte independientemente de la responsabilidad original por dicha contribución, y en tal caso no se impondrá penalidad a ninguna de dichas personas por haber dejado de declarar o pagar la contribución si no hubiere fraude o propósito de evadir el pago."

(18) No deberá entendérsenos como que indicamos que en el caso de *Aguirre* tanto la corporación doméstica como la Associates cumplieron con los requisitos de la ley respecto a las planillas. La corporación doméstica, que había radicado una planilla antes de la aprobación de la Ley núm. 31 de 1941, presentó una planilla corregida el día 11 de agosto de 1941, tal como lo exige la sec. 26 de la Ley núm. 31, véase el escolio 14; no pagó contribución alguna por el fundamento de que en su carácter de agente retenedor, no estaba obligada a ello, ya que la Associates no tenía ingreso neto alguno sujeto a tributación bajo la ley, tal como disponía cuando la corporación doméstica pagó los dividendos a la Associates. Por otra parte, aunque la Associates presentó una planilla el 14 de enero de 1941, aparentemente no radicó ninguna planilla corregida como lo exige la sec. 26. Aun cuando así lo hubiese hecho y hubiese atacado la validez de (1) la eliminación retroactiva de los créditos o deducciones por dividendos, (2) el aumento retroactivo del tipo contributivo, y (3) el tipo contributivo más alto fijado para entidades extranjeras comparado con el de entidades domésticas provisto en la Ley núm. 31 de 1941, no hubiese prevalecido. Casos citados en el escolio 10; *South Porto Rico Sugar Co.* v. *Buscaglia*, 154 F.2d 96 (C.A. 1, 1946).

este caso, como hemos notado, la Rico Telco no sólo no hizo la retención exigida por la sec. 22 (*a*), según fué enmendada por la sec. 4 de la Ley núm. 2 de 1939, sino que la ITT no radicó planilla alguna como lo exige la sec. 37 (*a*). Véase el escolio 11.

Los arts. 211 y 212 del Reglamento, ([19]) en que descansa la apelante no son aplicables al caso de autos en vista de lo resuelto por nosotros al efecto de que, por virtud de una enmienda del 1939, la apelante estaba obligada a retener la contribución sobre los dividendos. Los arts. 211 y 212 que fueron promulgados en el 1926, ([20]) han sido suplantados en tanto en cuanto estén en conflicto con las enmiendas de la Ley. Por consiguiente, no podemos convenir con la apelante en que el Gobierno está impedido de hacer valer su reclamación en el presente caso.

En vista del resultado a que hemos llegado, no es necesario

---

([19]) El art. 211 lee así: "Retención de la Contribución en el Origen.—En general, deberá retenerse (*a*) una contribución de 6 por ciento en el caso de ingresos fijos o determinables anuales o periódicos pagaderos a un individuo no residente que no sea ciudadano de Puerto Rico, o a una sociedad que no se dedique al comercio o industria en Puerto Rico y que no tenga una oficina o sitio de negocio en Puerto Rico, y que consista en todo o en parte de individuos no residentes que no sean ciudadanos de Puerto Rico, excepción hecha (1) de dividendos pertenecientes a la clase admitida como crédito por la subd. (*a*) de la sec. 18; (*b*) de una contribución de 12½ por ciento en el caso de ingresos fijos o determinables anuales o periódicos (con las excepciones inmediatamente precedentes) pagaderos a una corporación o sociedad extranjera que no se dedique al comercio o industria en Puerto Rico y que no tenga una oficina o sitio de negocios en Puerto Rico (sec. 35)."

El art. 212 lee en parte como sigue: "Ingresos Fijos o Determinables Anuales o Periódicos.—Únicamente los ingresos fijos o determinables anuales o periódicos estarán sujetos a retención. A fin de dar una idea del carácter general del ingreso de que aquí se trata, el estatuto incluye en dichos ingresos intereses, cánones de arrendamiento, salarios, jornales, primas, anualidades, compensaciones, remuneraciones y emolumentos. Podrán, no obstante, incluirse otras clases de ingreso como, por ejemplo, regalías."

([20]) El Reglamento de Contribución sobre Ingresos ha sido reimpreso pero, hasta donde nosotros sepamos, no se ha hecho una revisión general del mismo, ni se han efectuado cambios en los arts. 211 y 212, desde que el Reglamento fué originalmente aprobado en el 1926.

resolver qué efecto tiene la sec. 1 de la Ley núm. 54, Leyes de Puerto Rico, 1945, sobre este caso.([21])   No obstante, notamos de paso que la Ley núm. 54 de 1945 parece haber sido aprobada como resultado del lenguaje empleado en el caso de *Aguirre*, resuelto en el 1944, al cual nos adherimos.   En ese caso dijimos a la pág. 276: "Y aún esa misma ley de 1941 no contiene disposición alguna para autorizar expresamente al Tesorero de Puerto Rico, para que exija a las corporaciones que ya habían pagado los dividendos de 1940, que retengan, de los dividendos que sean declarados con posterioridad a los de 1940 o de los que se declararen en el futuro, el [aumento retroactivo en el] importe de la contribución impuesta por la nueva ley a los accionistas no residentes sobre los dividendos recibidos por ellos en el mes de julio de 1940.   Es la Legislatura—y no las cortes de justicia—la que está facultada para conceder esa autorización al Tesorero." (Corchetes nuestros.)

También es de notarse que si interpretáramos la Ley núm. 54 en el sentido de ser aplicable al caso que nos ocupa, ello no significaría que en el 1945 se estaba imponiendo una contribución retroactiva sobre el ingreso de 1940 o sea cinco años después del evento tributable.   Más bien significaría simplemente que, habiéndose impuesto una contribución válida en

---

([21]) La sec. 1 de la Ley núm. 54 lee en parte como sigue:

"Si un agente retenedor . . . hubiere dejado o dejare, en cualquier año a partir de enero 1 de 1940, de cumplir . . . con cualquiera de las disposiciones de la sección 22 o de la sección 35 de la Ley de Contribución Sobre Ingresos, núm. 74 de 1925 según ha sido posteriormente enmendada, no reteniendo en su origen la contribución imponible sobre los ingresos remitidos por ella a individuos no residentes que no sean ciudadanos de Puerto Rico o a corporaciones o sociedades que no hicieren negocios en Puerto Rico o que no tuvieren oficina en la Isla, dejando así de pagar la contribución correspondiente, vendrá obligada por esta Ley a cumplir con las disposiciones de la sección 22 o de la sección 35 según sea el caso, reteniendo del primer pago de ingresos que tuviere que hacer, después de la vigencia de esta Ley, o de pagos posteriores, si el primero no fuere suficiente, el importe de la contribución dejada de pagar; siempre y cuando que, dicho primer pago o pagos posteriores hubieren de hacerse al mismo individuo o a la misma corporación o sociedad respecto a los cuales no se hizo la retención de la contribución originalmente, según lo dispuesto en la sección 22 o en la sección 35 de la referida Ley de Contribución sobre Ingresos."

el 1941 sobre ingresos correspondientes al 1940, al agente retenedor se le requería en el 1945 que retuviera y pagara al Tesorero, de los pagos futuros de ingresos que se hicieran a la persona que en última instancia los recibiera, la contribución que, como cuestión sustantiva, ésta adeudaba pero no pagó en el 1941.[22]

Por las razones expuestas, el Tribunal Superior no erró al resolver que el Tesorero actuó correctamente al notificar a la Rico Telco deficiencias por no haber retenido las contribuciones de los dividendos pagados por ella en el 1940 a la ITT y a otros accionistas.[23]

## II

Durante los años 1940–44 la Rico Telco hizo ciertos pagos de intereses a la ITT y a la ISEC.[24]  Sostiene que Puerto Rico no está "constitucionalmente facultado" para imponer contribuciones sobre dichos intereses pagados por ella a la ITT y a la ISEC, corporaciones extranjeras que no hacen negocios en Puerto Rico, ". . . cuando la deuda sobre la cual se pagaron dichos intereses se incurrió fuera de Puerto Rico, y los intereses y el principal eran pagaderos fuera de Puerto

---

[22] También nos parece conveniente reproducir el lenguaje que usamos a la pág. 277 en el caso de *Aguirre:* "Si el Tesorero de Puerto Rico puede, de acuerdo con las leyes vigentes, sujetar o afectar en alguna forma los dividendos que ahora o en el futuro se encuentren en poder o bajo control de Central Aguirre Sugar Company y sean pagaderos a Central Aguirre Associates, o si el Tesorero de Puerto Rico puede, de acuerdo con nuestras leyes procesales, sujetar o afectar al pago de las contribuciones no satisfechas, las acciones que Central Aguirre Associates tiene en Central Aguirre Sugar Company, son cuestiones no envueltas en este procedimiento y por tanto las pasaremos sin expresar opinión sobre las mismas."

[23] La apelante admite, y nosotros convenimos en ello, que el problema de la retención por la Rico Telco de una contribución montante a $41.11 sobre dividendos ascendentes a $342 pagados por la Rico Telco a sus otros accionistas en el 1940, véase el escolio 1, se rige por consideraciones similares.  Por lo tanto, es innecesario examinar este punto en detalle.

La cuestión de las penalidades por no haber retenido la contribución sobre los dividendos correspondientes al 1940, se discute en la Parte III de esta opinión.

[24] Los detalles en cuanto a dichos pagos se encuentran en el segundo párrafo del escolio 1.

Rico, y cuando no existía evidencia concreta o tangible de tal deuda dentro de Puerto Rico, tales como bonos o pagarés, o depósitos bancarios, que requieren la sanción de las leyes de Puerto Rico para que puedan transferirse." (25)

La apelante alega que Puerto Rico "no tiene jurisdicción para imponer contribuciones" (26) sobre tales intereses y que su intento de hacerlo viola el debido procedimiento de ley. (27) Para poder determinar la validez de esta proposición, es necesario que sinteticemos brevemente los hechos relevantes de los cuales surgió la controversia que tenemos ante nos.

(a) *Hechos.*

La deuda sobre la cual se hicieron los pagos de intereses por la Rico Telco a la ITT se originó en tres formas. (28) Aparentemente las sumas mayores fueron tomadas a prés-

(25) Rechazamos, por las mismas razones expuestas en la Sección Primera de la Parte I de esta opinión, el argumento de la apelante de que de acuerdo con la sec. 31 de la Ley la Rico Telco no estaba obligada a retener la contribución sobre los intereses aquí envueltos. Una vez descartada esta contención, es claro que la Rico Telco estaba obligada a retener la contribución sobre dichos intereses de acuerdo con las secs. 15 y 19, siempre que no existan objeciones constitucionales válidas para ello.

Estamos de acuerdo en que la Rico Telco tiene capacidad para impugnar las deficiencias en este caso. *Valdés* v. *Sec. Hacienda,* 78 D.P.R. 578, 586–87; *Harvester Co.* v. *Dept. of Taxation,* 322 U. S. 435, 440.

(26) La frase "jurisdicción para imponer contribuciones" ". . . obscurece, en vez de aclarar, ya que sólo expone un resultado y no analiza el problema constitucional." El Juez Asociado Sr. Frankfurter, concurriendo en *State Tax Comm'n* v. *Aldrich,* 316 U. S. 174, a la pág. 183. Al mismo efecto, véase *Wisconsin* v. *J. C. Penny Co.,* 311 U. S. 435, 444, citado más adelante. Pero *cf.* el escolio 35.

(27) Antes de ser efectiva en 1952 la Constitución del Estado Libre Asociado de Puerto Rico, nuestras leyes tenían que cumplir con la regla Federal del debido procedimiento. La misma regla existe hoy día. *Mora* v. *Mejías,* 206 F.2d 377, 382 (C.A. 1, 1953); *Pueblo* v. *Fournier,* 77 D.P.R. 222, 257, escolio 6; *Figueroa* v. *People of Puerto Rico,* 232 F.2d 615, 619 (C.A. 1, 1956); *A. Roig, Sucrs.* v. *Junta Azucarera,* 77 D.P.R. 342, 346, escolio 5, confirmado en 235 F.2d 347 (C.A. 1, 1956), cert. denegado, 352 U. S. 928.

(28) El testimonio ofrecido por la apelante no demuestra el monto exacto de los préstamos para cada uno de los diferentes propósitos con que fueron hechos. Véase el escolio 44.

tamo como resultado del siguiente procedimiento: Cada año la Rico Telco preparaba un presupuesto demostrativo de (1) los ingresos estimados y (2) los gastos de operación y de construcción. *El presupuesto no entraría en vigor a no ser y hasta que el mismo fuera aprobado por la ITT, que era dueña del 99.84% de las acciones de la Rico Telco.* Esta aprobación se obtenía por medio de correspondencia que se originaba en Puerto Rico de parte de la Rico Telco y en Nueva York de parte de la ITT. Como cuestión de práctica, la aprobación de un presupuesto por la ITT bajo el cual los desembolsos estimados para un año en particular excedían los ingresos estimados, constituía un convenio de que la ITT haría frente al "déficit" de la Rico Telco,[29] haciéndole préstamos a ésta mediante anticipos en cuenta corriente sobre los cuales se pagaban intereses por la Rico Telco a la ITT sobre el balance promedio en descubierto al tipo del 6%.[30]

En segundo lugar, en adición a los préstamos que surgían de estimados de presupuesto, la ITT algunas veces hacía préstamos a la Rico Telco para varios fines del negocio, tales como salarios retroactivos, cuya necesidad surgió durante los años en cuestión. Nuevamente aquí tales préstamos se solicitaron mediante cartas o cables por la Rico Telco a la ITT que se originaron en Puerto Rico. Los mismos fueron concedidos mediante respuestas de la ITT enviadas desde Nueva York.

Un tercer método empleado ocasionalmente era el de que la ITT hiciera anticipos en efectivo en Nueva York para la cuenta de la Rico Telco para fines tales como el pago de salarios por servicios que se rendían en Nueva York para la Rico

---

[29] Principalmente, dichos "déficits" se debieron aparentemente a actividades de construcción.

[30] Teóricamente, este arreglo debió permitir a la Rico Telco pagar prontamente por sus compras de material y equipo. Sin embargo, aparentemente ya debido a que los estimados de gastos eran muy bajos o debido a gastos adicionales imprevistos, como se verá más adelante, la Rico Telco también pagó intereses en su cuenta corriente con la ISEC cuandoquiera esta última hacía dichas compras a nombre de la Rico Telco en los Estados Unidos.

Telco, gastos de viajes a Puerto Rico y para otros gastos del negocio de la Rico Telco.([31])

El récord o la evidencia de los préstamos anteriores—tanto por el principal como por los intereses—tomó la forma de "avisos de débito y crédito" enviados por la ITT desde Nueva York a la Rico Telco en Puerto Rico. Los pagos fueron hechos a la ITT por estos préstamos y sus intereses mediante cheques girados por la Rico Telco sobre su cuenta en un banco de Nueva York. Los fondos depositados en dicha cuenta provenían de tres fuentes: (1) principalmente de depósitos de la ITT cuando la Rico Telco los solicitaba; (2) fondos transferidos por la Rico Telco desde Puerto Rico a Nueva York; (3) préstamos a la Rico Telco hechos por varios bancos de Nueva York.

Los intereses pagados a la ISEC surgieron de lo siguiente: Rico Telco realizó todas sus compras de materiales y equipo —fuera de las compras hechas en Puerto Rico—a través de la ISEC como su agente compradora. Rico Telco haría a la ISEC pagos de tiempo en tiempo dependiendo de su situación económica. La deuda de la Rico Telco a la ISEC se llevaba en una cuenta corriente sobre la cual se pagaban intereses al 6%. Los cargos por intereses—así como los cargos por mercancías—se asentaban en la forma de "avisos de débito y crédito" mensuales enviados por la ISEC desde Nueva York a la Rico Telco en Puerto Rico. Al recibo de estos avisos de débito y crédito, la Rico Telco asentaba los cargos en sus libros en Puerto Rico. Igual que en el caso de pagos a la ITT, los pagos periódicos hechos por la Rico Telco a la ISEC—tanto por materiales como por intereses—se hacían por cheques sobre la misma cuenta de banco en Nueva York de la cual se pagaba a la ITT.

(b) *La jurisprudencia.*

La apelante descansa, entre otros, en el caso de *Domenech*

---

([31]) En adición, la Rico Telco ocasionalmente obtenía préstamos de bancos en Puerto Rico sujetos a la aprobación por la ITT.

v. *United Porto Rican Sugar Co.*, 62 F.2d 552 (C.A. 1, 1932), cert. denegado, 289 U. S. 739.([32])  En dicho caso tres corporaciones de Puerto Rico tomaron dinero a préstamo de ciertos bancos y corporaciones de Maryland.  Los contratos de préstamo estipulaban ". . . que el principal y los intereses serían pagaderos en Baltimore;  que el dinero prestado se entregaría a las corporaciones de Puerto Rico en Baltimore, y que los pagos de intereses, que constituyen el ingreso aquí tributado, se hicieron en Baltimore;  que ninguna de las corporaciones de Maryland hacía negocios en Puerto Rico, y no tenían oficinas, sitio de negocios, o agente en Puerto Rico;  que parte del dinero así prestado fué usada por las prestatarias en los Estados Unidos y parte en Puerto Rico . . .".  62 F.2d a la pág. 553.

La Corte de Apelaciones resolvió que a los bancos y corporaciones de Maryland no podía obligárseles a pagar la contribución de ingresos de Puerto Rico sobre intereses cobrados de los deudores, las corporaciones de Puerto Rico.  La Corte dijo a la pág. 555: ". . . La cuestión entonces es si la Asamblea Legislativa de Puerto Rico tenía jurisdicción y autoridad para imponer contribución sobre ingresos a corporaciones acreedoras no residentes que no tenían sitio de negocios en Puerto Rico y no hacían allí negocios a través de agentes o en alguna otra forma.  La contestación a esta pregunta es tan evidente que la mera exposición de la proposición constituye su propia contestación.  La Asamblea Legislativa de Puerto Rico no tiene autoridad o jurisdicción para imponer una contribución a corporaciones no residentes basada en ingresos devengados o a devengarse sobre transacciones realizadas y enteramente llevadas a cabo fuera de los límites de Puerto Rico.  A este respecto no tiene mayor poder que un estado." ([33])

([32]) Al mismo efecto, véase *Porto Rico Fertilizer Co.* v. *Sancho*, 98 F.2d 398 (C.A. 1, 1938).

([33]) La Corte de Apelaciones resolvió en la alternativa que la "deuda o crédito" allí envuelto (pág. 555) ". . . no tenía *situs* en Puerto Rico.

No podemos convenir en que la decisión y el lenguaje de la Corte de Apelaciones en el caso de la *United Porto Rican Sugar Co.* automáticamente conteste el problema que se nos presenta en el caso de autos. Debemos decidir este caso a la luz de sus hechos peculiares. Además, debemos aplicarle a los hechos como mejor podamos los casos resueltos por la Corte Suprema de los Estados Unidos después de la resolución del caso de la *United Porto Rican Sugar Co.*

La norma en casos de esta naturaleza quizás fué mejor expuesta en *Wisconsin* v. *J. C. Penney Co.*, supra, 444–45: ". . . 'Evento tributable,' 'jurisdicción para imponer contribuciones,' '*situs* comercial,' 'extraterritorialidad,' todos son medios breves de implicar la impotencia del poder de un estado porque el poder del estado nada tiene sobre qué operar. Estas denominaciones no son instrumentos de adjudicación sino manifestaciones de resultado al aplicar *la única norma constitucional para un caso como el presente. Esa norma es* si la

---

Su *situs* estaba en Maryland, fuera de la jurisdicción de Puerto Rico... . La cuestión del situs tributable de una deuda ha sido resuelta definitivamente por la reciente decisión de la Corte Suprema de los Estados Unidos en *Farmers' Loan & Trust Co.* v. *Minnesota*, 280 U. S. 204 . . .". Este razonamiento alternativo no parece tener ya ninguna validez. *State Tax Comm'n* v. *Aldrich*, supra; 1 Freund *et al.*, *Constitutional Law* 567. *Cf.* *Piacentini* v. *Buscaglia, Tes.*, 59 D.P.R. 767. De todos modos, cualquiera que pueda ser la validez del punto en cuanto al *situs* de la "deuda o crédito" envuelto en un préstamo en otras situaciones que envuelven otros hechos y otros tipos de contribuciones—*cf. John Hancock Mutual Life Insurance Co.* v. *Neill* y *The Union Central Life Insurance Co.* v. *Neill,*——P.2d—— (Idaho, 8 de febrero de 1957), 25 U.S.L.W. 2390–91, y casos citados; *Sancho* v. *Humacao Shipping Corporation*, 108 F.2d 157, 159–60 (C.A. 1, 1939); 8 Mertens, *Law of Federal Income Taxation*, sec. 45.29, pág. 295; *State* v. *Gay*, 46 So.2d 165 (Fla., 1950); Carpenter, *Jurisdiction over Debts for the Purpose of Administration, Garnishment, and Taxation*, 31 Harv. L. Rev. 905, 918–31; Lowndes, *Spurious Conceptions of the Constitutional Law of Taxation*, 47 Harv. L. Rev. 628—no vemos fin práctico en enfrascarnos aquí en esa clase de gimnasia dialéctica o en discutir algunos de nuestros casos viejos que cita la apelante. (Para una explicación parcial de algunos de nuestros casos anteriores en cuanto a imposiciones de contribuciones sobre "créditos", véase *Sucn. Giusti* v. *Tribl. Contribuciones*, 70 D.P.R. 117, 136–42.) Basta decir que la fórmula desarrollada en casos recientes de la Corte Suprema dicta el resultado a que aquí llegamos. Véase el texto de esta opinión que antecede al escolio 36.

propiedad se tomó sin el debido procedimiento de ley o, parafraseando, *si el poder de imponer contribuciones ejercitado por un estado tiene relación fiscal a la protección, oportunidades y ventajas concedidas por el estado. La cuestión sencilla pero, controladora, es si el estado ha dado algo a cambio de lo cual pueda pedir algo. . . . El hecho de que una contribución sea contingente sobre eventos que suceden fuera de un estado no destruye el nexo entre tal contribución y transacciones dentro de un estado por las cuales se impone la contribución. . . .*" (Bastardillas nuestras.)

La Corte Suprema ha reexpuesto esta fórmula en diferentes maneras en casos tales como *Curry* v. *McCanless*, 307 U. S. 357; *State Tax Comm'n* v. *Aldrich*, supra; *Harvester Co.* v. *Dept. of Taxation*, supra, 441–44; *Braniff Airways* v. *Nebraska Board*, 347 U. S. 590, 600–01; [34] y *Miller Bros.*

---

[34] El caso de *Braniff* trataba de la validez de una contribución estatal prorrateada ad valorem. En este caso no hay cuestión alguna en cuanto a prorrateo. Véanse *Harvester Co.* v. *Dept. of Taxation*, supra, 442; *Southwestern Gas & Electric Co.* v. *Oklahoma Tax Com'n*, 253 P.2d 549 (Okla., 1953); Mayoral, *Algunos Comentarios en Torno a Cierto Aspecto de los Sistemas Contributivos Estatales*, XVI Revista del Colegio de Abogados 43; Magill, *Allocation of Income by Corporate Contract*, 44 Harv. L. Rev. 935; Huston, *Allocation of Corporate Net Income for Purposes of Taxation*, 26 Ill. L. Rev. 725; Silverstein, *Problems of Apportionment in Taxation of Multistate Business*, 4 Tax L. Rev. 207; Hellerstein, *State and Local Taxation* 274; Hellerstein, *State Franchise Taxation of Interstate Businesses*, 4 Tax L. Rev. 95; 1 Freund *et al.*, *Constitutional Law* 645. Tampoco la apelante sostiene que en este caso esté envuelta cuestión alguna en cuanto a la cláusula de comercio. Compárense *Soltero* v. *Descartes*, 192 F.2d 755, 759 (C.A. 1, 1951); *Buscaglia* v. *Ballester*, 162 F.2d 805, 806 (C.A. 1, 1947), cert. denegado, 332 U. S. 816; y *P. R. Telephone Co.* v. *Tribl. de Contribuciones*, 68 D.P.R. 154, 162, con *Mora* v. *Mejías*, supra, pág. 387, escolio 6.

Aquí sólo tenemos que ver con la cláusula del debido procedimiento. Una contribución puede resistir con éxito objeciones basadas en el debido procedimiento aun cuando no las resista bajo la cláusula de comercio. El Juez Asociado Sr. Rutledge señala esto en su opinión concurrente en *Harvester Co.* v. *Dept of Treasury*, 322 U. S. 340 a la pág. 353: "Los conceptos de 'debido procedimiento' y 'cláusula de comercio' no siempre son claramente separables al tratar con estos problemas. Cf. e. g., *Western Union Telegraph Co.* v. *Kansas*, 216 U. S. 1. Hasta cierto punto se traslapan. Si existe ausencia del debido procedimiento para sostener la contribución, por ese hecho solamente cualquier carga que la contribución im-

*Co.* v. *Maryland*, 347 U. S. 340. (³⁵)  Estos casos envuelven hechos y tipos de contribuciones que se diferencian hasta cierto punto de los hechos y de la contribución aquí envueltos. Pero son importantes para nuestros fines porque proporcionan una guía en la búsqueda de los límites de los linderos exterio-

ponga sobre el comercio entre los estados se torna 'impropia'. Pero, aun cuando se traslapen, los dos conceptos no son idénticos. *Puede haber más que suficientes conexiones de hecho, con efectos económicos y legales, entre la transacción y el estado tributador para sostener la contribución contra objeciones del debido procedimiento. Sin embargo, la misma puede sucumbir por su efecto oneroso hacia el comercio.* Y, si bien las dos nociones no pueden siempre separarse, se conseguiría más claridad en la consideración y decisión de un caso si se enfocaran las dos cuestiones, cuando las mismas estén presentes, por lo menos tentativamente como si ambas fueran separadas y distintas y no mezcladas." (Bastardillas nuestras.)  En el caso de *Braniff*, a pesar de que el Juez Asociado Sr. Frankfurter disintió debido a su criterio de que la contribución era contraria a la cláusula de comercio, admitió que la misma no infringía la cláusula del debido procedimiento. 347 U. S. a las págs. 608–09. Véase *Ballester Hnos.* v. *Tribunal de Contribuciones*, 66 D.P.R. 560, 566, escolio 3, revocado por otros fundamentos en 162 F.2d 805 (C.A. 1, 1947), cert. denegado, 332 U. S. 816.

Al examinar el argumento de que un estatuto contributivo viola el debido procedimiento, debemos tener en mente que el contribuyente tiene ". . . el peso de la prueba . . . para eliminar toda posible base que pueda apoyar su validez." *South Porto Rico Sugar Co.* v. *Buscaglia,* supra, 100; *Rivera* v. *Buscaglia,* 146 F.2d 461, 465 (C.A. 1, 1944) ; *Buscaglia, Tes.* v. *Tribl. de Contribuciones; Pérez Vahamonde,* 68 D.P.R. 345, 362, aprobado en *Buscaglia* v. *Ahumada,* 171 F.2d 775 (C.A. 1, 1949) ; *Postley* v. *Secretario de Hacienda,* supra, 883–84. (Si bien estos casos envolvían contenciones de tributación discriminatoria más bien que "jurisdicción para imponer contribuciones," creemos que en esta última situación el peso de la prueba es el mismo.)

(³⁵) El caso de *Miller* revierte a la frase "jurisdicción para imponer contribuciones". *Cf. escolio* 26. Pero el caso de *Miller* no representa una desviación de los conceptos (1) que la contribución estatal no está limitada por colindancias territoriales per se y (2) que debe existir, sin embargo, alguna conexión entre el estado y el objeto de la contribución. Sobre el primer punto, la Corte se adhirió a expresiones en sus casos anteriores cuando indicó que (págs. 342–43) ". . . colindancias territoriales visibles no siempre establecen los límites de la jurisdicción o del poder de imponer contribuciones de un estado. . . . Si hay algún hecho o evento jurisdiccional que se sirva como conductor, el alcance del poder del estado para imponer contribuciones puede llegar a objetos sujetos a contribución fuera de sus límites. Cuando tiene al contribuyente dentro de su poder o jurisdicción puede algunas veces, por su conducto, llegar a sus transacciones o ingresos extraterritoriales. *Por otro lado, si tiene jurisdicción sobre sus bienes o transacciones tributables, puede algunas veces, mediante éstos llegar hasta*

res de la contribución estatal en un caso específico en lo que
respecta al debido procedimiento.(³⁶)

---

*el no residente."* (Bastardillas nuestras.) En cuanto al segundo punto,
dijo a las págs. 344–45: ". . . el debido procedimiento requiere algún esla-
bón definitivo, *alguna conexión mínima,* entre un estado y la persona, los
bienes o la transacción sobre los cuales intente imponer contribución."
(Bastardillas nuestras.)

Con votación de 5 a 4 el Tribunal resolvió que *bajo los hechos envueltos
en el caso de Miller,* el Estado de Maryland infringía el debido procedi-
miento al requerirle a un comerciante de Delaware que pagara una con-
tribución sobre uso—cobrada mediante embargo de su camión cuando tran-
sitaba por Maryland—por ventas de mercancía hechas en Delaware a
residentes de Maryland. Hasta donde sepamos, el caso de *Miller* es la
única ocasión en que la Corte Suprema ha invalidado una contribución
sobre uso por fundamentos del debido procedimiento. *The Supreme Court,
1953 Term,* 68 Harv. L. Rev. 96, 130; XXIX Tulane L. Rev. 356; 8 Vand.
L. Rev. 124; 53 Mich. L. Rev. 133. Es interesante indicar que 3 de los 5
jueces que concurrieron en la opinión de la mayoría en 1954—Reed, Jackson
y Minton—ya no son miembros de la Corte, mientras que los cuatro que
disintieron—Warren, Black, Douglas y Clark—todavía están allí. Sin em-
bargo, sería fútil para nosotros especular si la Corte Suprema, tal como
está constituida hoy día, se adheriría al resultado a que se llegó en el caso
de *Miller.* A nuestros fines, basta decir que nada encontramos en su
resultado—y ciertamente nada en su lenguaje—que se desvíe de la regla
establecida por la Corte Suprema en los otros casos citados en el cuerpo
de la opinión. Véase *Topps Garment Manufacturing Corporation* v. *State,*
128 A.2d 595 (Md., 1957).

(³⁶) La obra Wood, *Due Process of Law,* 1932–49, Capítulo V, págs.
341 *et seq.,* contiene una excelente discusión de los casos de la Corte Su-
prema en este campo, resueltos durante el período indicado. Y véanse
Freund *et al., Constitutional Law* 566; Hellerstein, *State and Local Taxa-
tion,* 468 *et seq.;* Hartman, *State Taxation of Interstate Commerce,* págs.
46, 80 *et seq.*

Para un reciente caso estatal que discute este problema en detalle y
que cita otros casos estatales, véanse *John Hancock Mutual Life Insurance
Co.* v. *Neill* y *The Union Central Life Insurance Co.* v. *Neill,* supra. Se
nos ha informado que en este caso está pendiente una moción de reconsi-
deración.

Igual que en muchos casos sobre debido procedimiento, la fórmula desa-
rrollada por la Corte Suprema es una de grado. *P. R. Telephone Co.* v.
*Tribl. Contribuciones,* supra 171. De conformidad, existen casos que caen
en cualquiera de los dos lados de la línea. Por tanto, cada caso debe resol-
verse sobre sus propios hechos. A veces es difícil determinar a qué categoría
cada caso específico pertenece; en verdad, los Jueces de la Corte Suprema
raras veces están *unánimes* sobre esta *cuestión.* Pero como aquí se ha
indicado, creemos que el resultado exigido por los hechos de este caso bajo
esta fórmula es claro.

(c)  *Aplicación de los casos del Tribunal Supremo a los hechos del presente.*

Cuando la Corte de Apelaciones resolvió el caso de la *United Porto Rican Sugar Co.* en 1932, no tuvo el beneficio de los posteriores casos de la Corte Suprema enfatizando en el contexto de los hechos de dichos casos la regla de que los estados pueden imponer una contribución si la misma está relacionada con "... protección, oportunidades y ventajas concedidas por el estado." 311 U. S. a la pág. 444.  Reconocemos, sin embargo, que aun bajo la última regla la Corte de Apelaciones pudo concebiblemente haber resuelto *bajo los hechos en el caso de la United Porto Rican Sugar Co.* que "las conexiones mínimas" entre Puerto Rico y las transacciones en cuestión según las exige la cláusula del debido procedimiento no existían.  Es decir, si como en el caso de *United Porto Rican Sugar Co.* (1) una corporación independiente que realiza negocios en Puerto Rico operando con extraños a iniciativa propia tomó a préstamo en Nueva York (2) de una corporación de Nueva York que no hace negocios ni tiene nexos de clase alguna aquí, (3) sin ningún pagaré u otra evidencia de la deuda localizada en Puerto Rico, y (4) con el interés y el principal del préstamo pagado por el deudor al acreedor en Nueva York, surgiría una cuestión sustancial en cuanto a si hubo alguna conexión entre Puerto Rico y tal transacción bajo la cual alguna protección, oportunidad o ventaja hubiera sido conferida por Puerto Rico que cumpliera con las objeciones del debido procedimiento a la imposición de la contribución sobre ingresos de Puerto Rico sobre el acreedor por los intereses pagádosle por el deudor.  Pero es innecesario contestar esa pregunta aquí porque los hechos de este caso son claramente distinguibles.

El presente no es un caso en que una corporación de Puerto Rico, a iniciativa propia, obtuvo un préstamo de extraños en Nueva York de una corporación no relacionada en forma alguna sin nexos en Puerto Rico.  Primeramente, la ITT, la contribuyente propiamente dicha en este caso, es dueña del

99.84% de las acciones de la Rico Telco, la deudora. En segundo lugar, según se desprende del Exhibit A y de otra evidencia en autos, la ITT tiene un contrato de gerencia con la Rico Telco bajo el cual sus honorarios son aparentemente un por ciento específico de los ingresos de la Rico Telco. En tercer lugar, y quizás lo más importante, el presupuesto anual de la Rico Telco—incluyendo la toma de dinero a préstamo sobre el cual la mayor parte de los intereses aquí envueltos iba a ser pagada—no podía tener eficacia hasta que la ITT lo aprobara. El efecto práctico de este arreglo presupuestal fué que la ITT, la acreedora—y no la Rico Telco, la deudora— hacía la decisión de si la deudora debiera hacer algún esfuerzo para obtener un préstamo, el producto del cual iba a ser usado casi totalmente en Puerto Rico.[37] En cuarto lugar, toda vez que gran parte del dinero tomado a préstamo iba a usarse para construcción y conservación, la aprobación de los presupuestos y de los préstamos no solamente significaba que la ITT recibiría intereses de la Rico Telco sobre tales préstamos, sí que también la ITT se beneficiaría con el negocio que la ISEC, su corporación subsidiaria, recibiría como agente compradora por los materiales y equipo comprados en los Estados Unidos con el dinero tomado a préstamo.[38] En quinto lugar, aun cuando no estaban redactados en el lenguaje de un pagaré otorgado por la deudora, los avisos de débito y crédito enviados por la ITT a la Rico Telco como evidencia de los préstamos—conjuntamente con las cartas y cables soli-

---

[37] Nos damos cuenta de que aun cuando las partes operen con extraños, la decisión final en cuanto a consumarse el préstamo, descansa con el acreedor potencial. Pero aquí había algo más. Rico Telco, una corporación subsidiaria, ni siquiera podía hacer la decisión de solicitar un préstamo—no importa quién pudiera ser el acreedor—sin la aprobación específica de su corporación madre, en vista del requisito de que el presupuesto anual de la Rico Telco estaba sujeto a aprobación por la ITT.

[38] Este punto también es relevante en cuanto a la contribución sobre los intereses pagados a la ISEC, más adelante discutida. Si bien los autos guardan silencio en cuanto a los cargos hechos por la ISEC a la Rico Telco por actuar como su agente compradora, creemos que es justo inferir que este servicio no se rindió gratis. Ciertamente los autos no controvirtieron esto.

citando y acusando recibo de tales préstamos y los libros de contabilidad de la Rico Telco que reflejaban estos préstamos y sus intereses—muy bien pueden considerarse a la luz de todas las circunstancias, para todo propósito práctico y legal, como evidencia tangible y concreta de la deuda físicamente localizada en Puerto Rico.([39])

Lo anterior representa a nuestro juicio suficiente cúmulo de contactos y lazos entre las transacciones resultantes en el pago de intereses a la ITT y Puerto Rico que justifica la imposición por el Estado Libre Asociado de una contribución de ingresos sobre tales intereses en lo que respecta al debido procedimiento. Existen varios detalles en los autos que ilustran cómo la concatenación de circunstancias en este caso hace frente a cualesquiera objeciones sobre el debido procedimiento basadas en una supuesta falta de conexión entre Puerto Rico y los intereses aquí envueltos. Por ejemplo, un intercambio de cartas entre la Rico Telco y la ITT demuestra gráficamente que la ITT dictaba actuaciones que tenían un impacto sustancial *en Puerto Rico* sobre el negocio de la Rico Telco y sobre la ganancia de la ITT de intereses en virtud de eventos en Puerto Rico. El 20 de octubre de 1944 el Contralor de la Rico Telco escribió al Vicepresidente y Contralor de la ITT en parte que "El Banco de Ponce ha indicado que ellos están prestos y deseosos de proporcionarnos fondos contra pagarés a la vista a no más de $3\frac{7}{8}\%$ de intereses cuandoquiera solicitemos tal financiamiento. . . . Nuestra revisión de septiembre del Presupuesto de 1944 proveyó la remisión de $100,000 de la ITT a nosotros antes de finalizar el año 1944, y el Presupuesto de 1945 dispone otros $100,000 al comienzo de 1945. Las economías que obtendríamos debido al tipo de interés más bajo y a la economía de contribuciones

---

([39]) En el último párrafo de su alegato la apelante solicita que resolvamos que Puerto Rico está impedido de imponer la contribución aquí envuelta ". . . a menos que existan en Puerto Rico pruebas tangibles y concretas de tal deuda tales como bonos o pagarés o depósitos bancarios que requieran la sanción y la protección de las leyes de Puerto Rico para permitir su transferencia."

debido al rechazo de la deducción de intereses pagados a la Compañía madre, aproximadamente $5,000, para ambas, no se han reflejado en el presupuesto."

El Vicepresidente y Contralor de la ITT contestó en 27 de octubre de 1944 como sigue: "Hemos considerado bastante el asunto de la prestación de fondos en Puerto Rico, según se explica en su carta del 20 de octubre. Esto es sólo financiamiento provisional y desde el punto de vista del Sistema de la ITT es insignificante. Tal financiamiento sólo reduciría temporalmente el monto de los adelantos de la ITT y desde el punto de vista de un Sistema aumentaría los cargos de intereses en total ya que tenemos fondos en exceso en Nueva York devengando poco o ningún interés. En consecuencia, no vemos ningún motivo para tomar a préstamo localmente estos fondos a corto plazo. Por el contrario, esperamos financiamiento adicional a largo plazo si y cuando, luego de la instalación del servicio automático en San Juan y Santurce, los beneficios podrían hacer frente a tales préstamos."

De estas cartas, presentadas en evidencia por la propia apelante, vemos que la Rico Telco deseaba tomar dinero a préstamo localmente con el fin de (1) pagar un tipo menor de interés y (2) deducir tales intereses como gastos al calcular su propia contribución sobre ingresos.(40) La ITT rehusó permitir esto. A su vez, como corporación madre, la ITT le ordenó a la Rico Telco que se privara en Puerto Rico de estas obvias y sustanciales ventajas económicas "desde el punto de vista del Sistema de la ITT." No resolvemos que estas cartas necesariamente indican conducta indebida de parte de la ITT. Llamamos la atención hacia ellas para reforzar nuestra tesis

(40) La sec. 32(a)(2) de la Ley de Contribuciones sobre Ingresos fué enmendada por la Ley núm. 31, Leyes de Puerto Rico, 1941, para disponer que los intereses no serán deducibles al computar el ingreso neto de una corporación cuando son "pagaderos . . . entre dos corporaciones cuando una de ellas posea o controle más de un cincuenta (50) por ciento de las acciones emitidas (outstanding stock) por la otra corporación." Véanse Buscaglia, Tes. v. Tribl. de Contribuciones; Rullán, 67 D.P.R. 585, confirmado en 168 F.2d 401 (C.A. 1, 1948); Comunidad Fajardo v. Tribl. Contribuciones, 73 D.P.R. 543, 549-54.

de que la combinación de los anteriores cinco factores en este caso demuestra que la ITT no era un acreedor ordinario, sin lazos o transacciones en Puerto Rico, que como un extraño concede un préstamo a un deudor en Nueva York, y que recibe los intereses sobre el mismo en Nueva York. Más bien estas cartas demuestran gráficamente el punto de que bajo las peculiares circunstancias de este caso los intereses aquí envueltos surgieron de transacciones que enlazan con suficientes contactos de parte de la ITT con Puerto Rico para justificar la conclusión de que no puede haber objeción del debido procedimiento para la imposición de contribuciones de ingresos por Puerto Rico sobre dichos intereses.

Creemos que debe también indicarse que desde el 1940 la Rico Telco voluntariamente ha retenido la contribución de ingresos pagadera por la ITT sobre los honorarios de gerencia que la Rico Telco le paga a la ITT. Véase el Exhibit A. Nada hay en los autos que revele la naturaleza de los servicios prestados por la ITT a la Rico Telco por estos honorarios de gerencia ni el lugar o lugares en que se prestaron. Sin embargo, es difícil visualizar cómo se podían prestar estos servicios sin contacto alguno—bien por servicios prestados por el personal de la ITT o de alguna otra manera—de la ITT con Puerto Rico. Ciertamente—en vista del hecho de que la Rico Telco retuvo y pagó a nombre de la ITT nuestra contribución sobre ingresos sobre los honorarios de gerencia por tales servicios—tanto la Rico Telco como la ITT han asentido en el criterio de que los servicios prestados por la ITT resultaron en suficientes nexos con Puerto Rico como para que la ITT esté sujeta a la contribución sobre ingresos por los honorarios de ésta en tanto en cuanto respecta al debido procedimiento. Si honorarios de gerencia pueden ser pagados por una compañía de servicio público que opera en Puerto Rico a su corporación madre primariamente es una cuestión a determinarse en primera instancia en un procedimiento adecuado por la Comisión de Servicio Público, y no por los tribunales en un caso contributivo. Véase *P. R. Ry., Lt. & P.*

*Co.* v. *Buscaglia, Tes.*, 62 D.P.R. 597, 607–14. Pero opinamos que es justo concluir de la mera existencia de tal contrato de gerencia, del pago de honorarios bajo el mismo por la Rico Telco a la ITT, del pago voluntario de nuestra contribución de ingresos sobre tales honorarios a nombre de la ITT, y de las otras circunstancias de este caso, que las rentas devengadas por la ITT—incluyendo los intereses aquí envueltos— surgieron de contactos con Puerto Rico por los cuales el Estado Libre Asociado proporcionó la "protección, las oportunidades y las ventajas" que justificaron la contribución de que se trata como cuestión del debido procedimiento.([41])

Finalmente, al considerar la naturaleza de los contactos de la ITT con Puerto Rico, es pertinente señalar que la apelante admite que desde el 1941 la Rico Telco ha válidamente retenido y pagado al Secretario de Hacienda la contribución de ingresos impuesta sobre los dividendos pagados a la ITT por la Rico Telco. En verdad, los accionistas individuales no residentes envueltos en el caso de *Postley* no impugnaron a base de fundamentos del debido procedimiento el poder de Puerto Rico para imponer una contribución sobre dividendos pagados a ellos sobre sus acciones en corporaciones que hacían negocios en Puerto Rico. *Postley* v. *Secretario de Hacienda*, supra.([42]) Quizás haya más justificación desde el punto de vista constitucional para la imposición de contribuciones sobre

---

([41]) Puede admitirse que los detalles de sus operaciones en Puerto Rico fueron ejecutados .por la Rico Telco. Pero creemos que bajo todas las circunstancias concurrentes—ciertamente en cuanto a los préstamos aquí envueltos, hechos mayormente para fines de construcción y que requerían la aprobación específica de la ITT en los presupuestos anuales—la política global de la Rico Telco estaba controlada por la ITT. Al llegar a esta conclusión no estamos diciendo que la ITT hacía negocios en Puerto Rico en el sentido en que esa frase es usada en otros contextos. *Cf. International Shoe Co.* v. *Washington*, 326 U. S. 310; *Elliott & Sons Co.* v. *Nuodex Products Co.*, 243 F.2d 116 (C.A. 1, 26 de marzo de 1957); *Pueblo* v. *South P. R. Sugar Co.*, 56 D.P.R. 661. Nuestra resolución sobre este aspecto del caso se limita al punto de la "jurisdicción para imponer contribuciones" basado en la cláusula del debido procedimiento levantado por la apelante.

([42]) En el caso de *Postley* accionistas individuales no residentes impugnaron con éxito bajo la cláusula de privilegios e inmunidades los tipos *discriminatorios* de contribución sobre ingresos a que estaban sujetos tales

tales dividendos al compararse con imposición de contribuciones sobre intereses pagados a individuos o a corporaciones no residentes. _Cf. John Hancock Mutual Life Insurance Co._ v. _Neill_ y _The Union Central Life Insurance Co._ v. _Neill_, supra, y casos allí citados. Pero no está de más indicar que estos dividendos pueden rastrearse por lo menos en parte a la intervención por la ITT en las decisiones de gerencia y de política de la Rico Telco. Los presupuestos de ésta, según se aprobaban por la ITT, contenían programas de construcción que indudablemente contribuían hacia la obtención de dividendos. Tal construcción fué hecha posible por los préstamos cuyos intereses se le pagaban a la ITT. Una vez más encontramos lazos y eslabones entre Puerto Rico y la obtención de tales intereses suficientes para hacer frente a las objeciones constitucionales esgrimidas por la apelante contra la imposición de nuestra contribución de ingresos sobre dichos intereses. ([43])

Creemos que el mismo razonamiento puede ser aplicado a los otros préstamos que la ITT hizo a la Rico Telco (1) en adición a los requisitos presupuestales, para varios propósitos del negocio y (2) como adelantos de contado en Nueva York por salarios y otros gastos del negocio a cuenta de la Rico Telco. Todos los préstamos eran parte del método usado por la ITT para controlar y ayudar a la Rico Telco en la gerencia y operación del negocio de ésta como empresa de servicio público que operaba exclusivamente en Puerto Rico. Además, aun cuando los préstamos en estas dos últimas categorías fue-

---

dividendos; se les exigió que pagaran nuestra contribución de ingresos sobre los mismos al mismo tipo que pagaban los residentes. 75 D.P.R. a la pág. 899.

([43]) También notamos que si la Rico Telco pagó dividendos a su corporación madre, tales pagos no eran deducibles al calcular la contribución sobre ingresos impuesta por nuestra Ley de Contribuciones sobre Ingresos a la Rico Telco; por otro lado, los pagos de intereses hechos por la Rico Telco a la ITT eran deducibles hasta que su deducción fué prohibida por la Ley núm. 31 de 1941, que era retroactiva al primero de enero de 1940. Véase el escolio 40.

ren suficientemente diferentes de los préstamos resultantes de los estimados de presupuesto como para justificar una conclusión diferente, la apelante tenía el peso de la prueba para demostrar el importe exacto de cada préstamo para poder salir victoriosa en un pleito contra deficiencias por contribuciones de ingresos impuestas sobre los intereses de dichos préstamos. Véase *Misbourne Pictures Limited* v. *Johnson*, 189 F.2d 774, 776 (C.A. 2, 1951). La apelante no hizo esfuerzo durante la vista para demostrar el monto exacto de los préstamos otorgados por la ITT a la Rico Telco en cada una de las tres categorías.(44) Por consiguiente, no estamos en posición de tratar diferentemente los intereses sobre las varias clases de préstamos hechos por la ITT a la Rico Telco aun cuando estuviésemos dispuestos a así hacerlo.

No vemos motivo alguno para tratar los pagos de intereses a la ISEC de manera diferente. Igual que en el caso de la ITT, no llegamos a la cuestión que se nos presentaría si la ISEC fuera un agente comprador independiente operando como un extraño con la Rico Telco y cargándole a ésta un 6% en cuenta corriente. Aquí la ITT, dueña del 99.84% de las acciones de la Rico Telco, también era dueña de todas las acciones de la ISEC. Como hemos visto, el presupuesto que la ITT aprobó finalmente produjo las compras hechas por la ISEC, que a su vez resultaron en los intereses aquí envueltos. También, una vez más la evidencia de la deuda—los avisos de débito y crédito—fueron cursados desde Nueva York y localizados en Puerto Rico. Sustancialmente por los mismos motivos ya consignados en cuanto a los intereses pagados a la ITT, no encontramos objeción válida en cuanto al debido procedimiento en relación con la contribución de ingresos impuesta sobre los intereses pagados por la Rico Telco a la ISEC.(45)

---

(44) Véase el escolio 28.

(45) *Cf. Rojo. vda. de Goicochea* v. *Tribunal de Contribuciones*, resuelto por opinión *per curiam* el 3 de marzo de 1954; *González* v. *Secretario de Hacienda*, 75 D.P.R. 920.

En vista del resultado a que hemos llegado, es innecesario determinar si el poder de Puerto Rico para imponer contribuciones sobre ingresos está sujeto a las limitaciones constitucionales que se aplican a un estado de la Unión, o si su poder en este campo, por lo menos con referencia a las consideraciones sobre debido procedimiento basadas en "jurisdicción para imponer contribuciones", es análogo al del Congreso. *Cf. Rivera* v. *Buscaglia,* supra; *Domenech* v. *Havemeyer,* 49 F.2d 849 (C.A. 1, 1931); *Postley* v. *Secretario de Hacienda,* supra, págs. 893–94, escolio 12, 897; *Ballester* v. *Tribunal de Apelación,* supra, 510; *West India Oil Co.* v. *Domenech,* 311 U. S. 20; *Buscaglia* v. *Ballester,* supra; *Irizarry* v. *Corte,* 64 D.P.R. 94, 105; *Domenech* v. *National City Bank,* 294 U. S. 199; *Domenech* v. *United Porto Rican Sugar Co.,* supra; *Cook* v. *Tait,* 265 U. S. 47; *Burnet* v. *Brooks,* 288 U. S. 378; *Roig Commercial Bank* v. *Buscaglia, Tes.,* 74 D.P.R. 986; *A. C. Monk & Co.* v. *Com'r of Int. Rev.,* 10 T. C. 77; *Motty Eitingon* v. *Com'r of Int. Rev.,* 27 B.T.A. 1341; 8 Mertens, supra, pág. 295; *South Porto Rico Sugar Co.* v. *Com'r of Int. Rev.,* 2 T. C. 738; Anotaciones, 12 A.L.R.2d 360, 156 A.L.R. 1370; Angell, *The Non-Resident Alien: A Problem in Federal Taxation of Income,* XXXVI Col. L. Rev. 908; Rudick y Allen, *Tax Aspects of Operations under the Puerto Rican Exemption Program,* 7 Tax L. Rev. 403, 425; Nota, *Taxation of Income from Foreign Sources,* 68 Harv. L. Rev. 1036.([46])

(46) En el caso de *Treichler* v. *Wisconsin,* 338 U. S. 251, la Corte dijo a las págs. 256–57: "Un estado no está equipado con los implementos de poder y diplomacia fuera de sus límites, que se hallan en la raíz del indudable derecho del Gobierno Federal para medir su contribución sobre bienes extranjeros. *United States* v. *Bennett,* 232 U. S. 299 (1914); véase *Burnet* v. *Brooks,* 288 U. S. 378 (1933). Y si el estado nada ha ofrecido a cambio de lo que demanda, su estatuto contributivo está en contra del debido procedimiento de ley que debemos hacer prevalecer." La Corte añadió en el escolio 4 a la pág. 257: "Desde luego nos hemos negado a dejarnos gobernar por esta consideración cuando al así hacerlo resultaría en evitar el pago de todas las contribuciones estatales."

## III

La sec. 58 (a) de la Ley de Contribuciones sobre Ingresos dispone una penalidad de 5% "si una parte de cualquier deficiencia fuere debida a negligencia o a ignorancia intencional de las reglas y reglamentos, pero sin la intención de defraudar . . .". El tribunal sentenciador, sin adelantar motivos para ello, sostuvo la imposición de las penalidades del 5%, ascendentes a $2,272.54, porque la apelante no retuvo las contribuciones adeudadas por la ITT y la ISEC sobre los dividendos e intereses pagádosles por la Rico Telco durante los años en cuestión.

Convenimos en que estas penalidades no debieron haberse impuesto en este caso. En cuanto a la penalidad por dejar de retener contribuciones sobre los dividendos del año 1940, este Tribunal como ya se ha dicho resolvió en *Central Aguirre* v. *Tribunal de Contribuciones*, supra, que una entidad en la misma situación de la apelante no venía obligada a retener dicha contribución. Es verdad que el caso de *Central Aguirre* no había sido resuelto cuando la apelante se enfrentó con este problema y que en la Parte I hemos revocado esa porción del caso de *Central Aguirre*. Pero en 1940–41 éste era un problema nuevo y complicado; en verdad, así se demuestra por el hecho de que este Tribunal cometió error en el caso de *Central Aguirre* al tratar de resolverlo. Sustancialmente de igual manera, la Rico Telco se creyó justificada por el caso de la *United Porto Rican Sugar Co.* al no retener la contribución sobre los intereses, y un número de casos de la Corte Suprema en que hemos descansado en la Parte II fueron resueltos después de que la Rico Telco radicara las planillas en cuestión. Por estos motivos, no podemos convenir en que la deficiencia en este caso "fuere debida a negligencia o ignorancia intencional de las reglas y reglamentos . . .". 10 Mertens, supra, sec. 55.25, págs. 50–55; Hoffman, *Intentional Disregard of Rules and Regulations*, 28 Taxes 111; *Lilly* v. *Com'r of Int. Rev.*, 14 T. C. 1066, 1086–87; *Heffelfinger* v.

*Com'r of Int. Rev.*, 32 B.T.A. 1232; véase *Spies* v. *United States*, 317 U. S. 492, 496–97. ([47])   El entonces Tesorero no tenía justificación al imponer las penalidades del 5% en este caso.

*La sentencia del Tribunal Superior será modificada para eliminarle las penalidades del 5%. Así modificada, la sentencia será confirmada.*

El Juez Asociado Sr. Marrero, aun cuando estuvo ausente al firmarse sentencia en el caso, estuvo presente en la vista y en la discusión del mismo, y está de acuerdo con la opinión emitida en este caso y con la sentencia.

Los Jueces Asociados Sres. Sifre y Belaval no intervinieron.

---

([47]) El caso de *Fides, A. G.* v. *Commissioner of Internal Revenue*, 137 F.2d 731, 735 (C.A. 4, 1943), cert. denegado 320 U. S. 797, único citado por el Secretario de Hacienda, es distinguible.   Allí estaba envuelta la cuestión de no radicar a tiempo una planilla.   Y véase *Comunidad Fajardo* v. *Tribl. Contribuciones*, supra, págs. 547–49.